QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
51 Madison Ave, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
alexspiro@quinnemanuel.com

Christopher G. Michel (*pro hac vice*)
Rachel G. Frank (California Bar No. 330040)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
christophermichel@quinnemanuel.com
rachelfrank@quinnemanuel.com

*Attorneys for Respondent Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Applicant,<br><br>        v.<br><br>ELON MUSK,<br><br>                Respondent. | Case No. 3:23-mc-80253-LB<br><br>**OPPOSITION TO SECURITIES AND EXCHANGE COMMISSION'S NOTICE AND APPLICATION FOR AN ORDER COMPELLING COMPLIANCE WITH AN ADMINISTRATIVE SUBPOENA** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 2

LEGAL STANDARD ................................................................................................. 7

ARGUMENT .............................................................................................................. 7

I.   THE SEC'S HARASSMENT OF MR. MUSK EXCEEDS ITS AUTHORITY ................... 8

    A.   This Subpoena Is The Latest In A Long String Of SEC Abuses Of Its
        Investigatory Authority ...................................................................................... 9

    B.   This Present Investigation Should Have Concluded A Year Ago ........................... 10

    C.   The SEC Misconstrues The Record When In Fact Mr. Musk Timely
        Objected To The SEC's Unreasonable And Irrelevant Discovery Demands ......... 12

II.  THE SEC SEEKS IRRELEVANT AND IMMATERIAL INFORMATION ..................... 14

III. ENFORCEMENT OF THE SUBPOENA WOULD VIOLATE THE
    CONSTITUTION ........................................................................................................ 15

    A.   The Appointments Clause Does Not Permit Issuance Of The Subpoena By
        A SEC Enforcement Staff Member .................................................................... 16

        1.   The Appointments Clause Provides The Exclusive Method For
            Appointing Government Officials Who Exercise Significant
            Government Authority Pursuant To Law ..................................................... 16

        2.   The Issuance Of An Administrative Subpoena Constitutes The
            Exercise Of Significant Government Authority Subject To The
            Appointments Clause ................................................................................. 17

        3.   The SEC Staff Who Issued The Subpoena Are Unconstitutionally
            Appointed .................................................................................................. 19

        4.   The Subpoena Is Accordingly Improper ........................................................ 20

    B.   Enforcement Division Staff Are Unconstitutionally Shielded From Removal ....... 20

IV.  THE COURT SHOULD STAY THIS PROCEEDING PENDING THE SUPREME
    COURT'S RESOLUTION OF *JARKESY* .................................................................. 22

CONCLUSION ........................................................................................................... 23

1

**TABLE OF AUTHORITIES**

2
**Page**

3

**Cases**

4

*Amini v. AUS Mktg. Rsch. Sys., Inc.*,
5     No. SA-CV-15-1270(AG)(JCGx), 2016 WL 7647690 (C.D. Cal. Feb. 26, 2016) ................. 23

6 *In re Application for Ord. Quashing Deposition Subpoenas*, No. M8-85, 2002 WL
    1870084 (S.D.N.Y. Aug. 14, 2002) ........................................................................................ 13
7

*Buckley v. Valeo*,
8     424 U.S. 1 (1976) ............................................................................................................... 17, 18

9 *Calcutt v. Fed. Deposit Ins. Corp.*,
    37 F.4th 293 (6th Cir. 2022) .................................................................................................. 23
10

11 *CMAX, Inc. v. Hall*,
    300 F.2d 265 (9th Cir. 1962) ................................................................................................. 23
12

*Cody v. Kijakazi*,
13     48 F.4th 956 (9th Cir. 2022) .................................................................................................. 20

14 *Collins v. Yellen*,
    141 S. Ct. 1761 (2021) .......................................................................................................... 22
15

16 *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
    592 F. Supp. 3d 568 (E.D. Tex. 2022) .................................................................................. 23
17

18 *Cont'l Assurance Co. v. Lombardo*,
    CIV.A. No. 85-4867, 1988 WL 94321 (E.D. Pa. Sept. 7, 1988) ............................................ 14

19 *Dyno Nobel, Inc. v. Johnson*,
    586 F. Supp. 3d 657 (E.D. Ky. 2022) .................................................................................... 14
20

21 *Edmond v. United States*,
    520 U.S. 651 (1997) ............................................................................................................... 16
22

*EEOC v. Children's Hosp. Med. Ctr. of N. California*,
23     719 F.2d 1426 (9th Cir. 1983) ............................................................................................... 14

24 *FDIC v. Garner*,
    126 F.3d 1138 (9th Cir. 1997) ................................................................................................. 7
25

26 *Fed. Hous. Fin. Agency v. SFR Invs. Pool 1, LLC*,
    No. 2:17-CV-00914-GMN-PAL, 2018 WL 1524440 (D. Nev. Mar. 27, 2018) ............... 13, 15
27

*Flatt v. SEC*,
28     No. 10-60073-MC, 2010 WL 1524328 (S.D. Fla. Apr. 14, 2010) ........................................ 12

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ................................................................................................ passim

*Freytag v. Comm'r of Internal Revenue*,
    501 U.S. 868 (1991) ........................................................................................................ 16

*Gewerter v. SEC*,
    No. CV-16-02556-PHX-DLR, 2016 WL 4074117 (D. Ariz. Aug. 1, 2016) .......................... 12

*In re Grand Jury Investigation*,
    315 F. Supp. 3d 602 (D.D.C. 2018) ................................................................................ 18

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) ........................................................................................................ 21

*Int'l Waste Controls, Inc. v. SEC*,
    362 F. Supp. 117 (S.D.N.Y. 1973) ................................................................................ 8, 15

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023) ........................... 2, 22, 23

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018) ................................................................................................ passim

*Mediterranean Enters. Inc. v. Ssangyong Corp.*,
    708 F.2d 1458 (9th Cir. 1983) ........................................................................................ 23

*Morrison v. Olson*,
    487 U.S. 654 (1988) ........................................................................................................ 18

*Myers v. United States*,
    272 U.S. 52 (1926) ..................................................................................................... 18, 21

*Nelson v. SEC*,
    No. C08-80080-MISC-(JF)(HRL), 2008 WL 2444794 (N.D. Cal. June 16,
    2008) ............................................................................................................................... 12

*O'Hanlon v. 24 Hour Fitness USA, Inc.*,
    No. 15-CV-01821-BLF, 2016 WL 815357 (N.D. Cal. Mar. 2, 2016) ..................................... 23

*Oklahoma Press Pub. Co. v. Walling*,
    327 U.S. 186 (1946) ..................................................................................................... 1, 8

*Peters v. United States*,
    853 F.2d 692 (9th Cir. 1988) ................................................................................... 1, 14, 15

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
    881 F.3d 75 (D.C. Cir. 2018) ............................................................................................ 21

*Prudential Ins. Co. of America v. Lai*,
   42 F.3d 1299 (9th Cir. 1994) ..................................................................................14

*Resol. Tr. Corp. v. Walde*,
   18 F.3d 943 (D.C. Cir. 1994) ..............................................................................8, 11

*RNR Enters., Inc. v. SEC*,
   122 F.3d 93 (2d Cir. 1997) ...................................................................................12

*Rondeau v. Mosinee Paper Corp.*,
   95 S. Ct. 2069 (1975) .............................................................................................4

*Rosiere v. SEC*,
   No. 2:09-CV-01975(JCM)(PAL), 2010 WL 489526 (D. Nev. Feb. 5, 2010) .........12

*Ryder v. United States*,
   515 U.S. 177 (1995) ..............................................................................................20

*SEC v. Blackfoot Bituminous, Inc.*,
   622 F.2d 512 (10th Cir. 1980) ..............................................................................12

*SEC v. Brigadoon Scotch Distrib.*,
   480 F.2d 1047 (2d Cir. 1973) ........................................................................1, 8, 9

*SEC v. Jerry T. O'Brien, Inc.*,
   467 U.S. 735 (1984) ...................................................................................7, 13, 14

*SEC v. Musk*,
   1:18-cv-8865 (S.D.N.Y.) ..........................................................2, 3, 9, 10, 12

*SEC v. Obioha*,
   No. 12-cv-80109-WHA, 2012 WL 4889286 (N.D. Cal. Oct. 12, 2012) ...................7

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
   140 S.Ct. 2183 (2020) ..........................................................................................21

*In re Tesla Inc. Sec. Litig.*,
   No. 18-CV-04865-EMC, Dkt. No. 671 (N.D. Cal. Feb. 3, 2023) ........................3, 9

*Twitter, Inc. v. Elon R. Musk, X Holdings I, Inc., and X Holdings II, Inc.*,
   No. 2022-0613-KSJM, Dkt. No. 1 (Del. Ch. July 12, 2022) ............................10, 15

*United States v. Arthrex, Inc.*,
   141 S. Ct. 1970 (2021) .....................................................................................16, 20

*United States v. Donziger*,
   38 F.4th 290 (2d Cir. 2022) ..................................................................................18

*United States v. Fensterwald*,
   553 F.2d 231 (D.C. Cir. 1977) ..............................................................................15

*United States v. Germaine*,
    99 U.S. 508 (1878) ................................................................................................18

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950) ...........................................................................................8, 11

*United States v. Powell*,
    379 U.S. 48 (1964) .................................................................................................7

*United States v. Providence Journal Co.*,
    485 U.S. 693 (1988) ..............................................................................................18

**Constitutional Provisions, Statutes & Rules**

U.S. Const. art. II, § 1, cl. 1 ..............................................................................................21

U.S. Const. art. II, § 2, cl. 2 ............................................................................... 1, 16, 19

5 U.S.C. § 2301 ................................................................................................................22

5 U.S.C. § 2302 ................................................................................................................22

5 U.S.C. § 4802 ..........................................................................................................18, 22

15 U.S.C. § 7217(d)(3) .....................................................................................................21

15 U.S.C. § 77s(c) ............................................................................................................19

15 U.S.C. § 78u(b) ...........................................................................................................19

28 U.S.C. § 542 ................................................................................................................18

17 C.F.R. § 200.10 ...........................................................................................................18

17 C.F.R. § 200.30-4 ..................................................................................................19, 20

17 C.F.R. § 240.10b-5 ................................................................................................3, 4, 9

17 C.F.R. § 240.13d-1 .......................................................................................................3

**Additional Authorities**

*Appointment & Removal of Fed. Rsrv. Bank Members of the Fed. Open Mkt.
    Comm.*, 2019 WL 11594453 (Oct. 23, 2019) ...................................................20

*In the Matter of Joseph Theodore Lukens, Jr., Respondent.*, Release No. 98542,
    (Sept. 27, 2023) .....................................................................................................3

*In the Matter of Lawrence I. Rosen, Respondent.*, Release No. 98545 (Sept. 27, 2023)...................................................................................................................... 3

*In the Matter of Norman M.K. Louie and Mount Kellett Capital Management LP, Respondents.*, Release Nos. 83637; 4968 (July 16, 2018) .......................... 4

*In the Matter of WCAS Mgmt. Corp., Respondent.*, Release No. 89914 (Sept. 17, 2020)...................................................................................................................... 4

*Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73 (2007) ........................................................................................ 17

SEC Union, Collective Bargaining Agreement (NTEU Chapter 293 Authorized Version) ................................................................................................................ 22

OPPOSITION TO APPLICATION FOR ORDER COMPELLING COMPLIANCE WITH SUBPOENA

# INTRODUCTION

This subpoena is the latest in a litany of duplicative and harassing demands the Securities and Exchange Commission ("SEC" or "Commission") has made under the guise of never-ending investigations into Mr. Musk and companies in which he holds leadership roles or financial stakes. Numerous previous attempts by the SEC to obtain information from Mr. Musk have not resulted in any finding of liability.  Indeed, the only issue to ever reach a jury resulted in near-immediate exoneration of Mr. Musk.  Yet the SEC persists in attempting to tarnish Mr. Musk's record with baseless investigations.  In the application now before the Court, the SEC seeks to require Mr. Musk to appear for testimony for the third time in an eighteen-month-long investigation prompted by nothing more than allegedly days-late filings.  The application should be denied for multiple reasons.

First, the subpoena reflects bad faith rather than a legitimate investigatory purpose. "[W]hile the SEC is entitled to great freedom in conducting its investigations, it is not at liberty to act unreasonably." *SEC v. Brigadoon Scotch Distrib.*, 480 F.2d 1047, 1056 (2d Cir. 1973); *see, e.g.*, *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 217 (1946).  A year and a half into this investigation on alleged late filings, it is unreasonable for the SEC to request Mr. Musk's testimony for a third time.  Such harassment is a paradigmatic basis for denying an administrative subpoena.

Second, the subpoena seeks irrelevant and immaterial information far beyond any plausible permissible scope of the investigation.  "An administrative subpoena [] may not be so broad so as to be in the nature of a 'fishing expedition.'"  *Peters v. United States*, 853 F.2d 692, 700 (9th Cir. 1988).  But that is precisely what the SEC has undertaken here.  The Commission has already asked Mr. Musk eight hours' worth of questions over two separate sessions regarding the filings, and he has produced hundreds of documents.  Although the SEC claims to have further questions for Mr. Musk, it has not identified any relevant or material information it lacks.

Finally, in its fevered pursuit of Mr. Musk, the SEC has exceeded fundamental restraints imposed by the Constitution on executive action.  The issuance of an administrative subpoena demanding Mr. Musk's testimony is an exercise of significant governmental authority of the kind that can be performed only by "Officers of the United States."  U.S. Const. art. II, § 2, cl. 2.  And under Article II, such officers can be appointed only by the President, a court, or the head of a

department.  *See Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018).  But the subpoena to Mr. Musk was not issued by anyone appointed in compliance with those requirements.  It was issued by an SEC staff member who was appointed by the SEC Director of Enforcement.  The subpoena is therefore unlawful under the Appointments Clause, and the SEC's application should be denied on that basis. It should also be denied on the independent ground that the SEC staff member who issued the subpoena is impermissibly insulated from presidential supervision by at least two layers of statutory removal protection.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010).  Indeed, the Fifth Circuit recently struck down the statutory removal protections for SEC Administrative Law Judges (ALJs) in a decision now on review before the Supreme Court.  *Jarkesy v. SEC*, 34 F.4th 446, 463 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023).

For any or all of those reasons, this Court should reject the SEC's application to enforce its invalid subpoena.  In the alternative, the Court should stay these proceedings pending the Supreme Court's decision in *Jarkesy*.

## BACKGROUND

For five years and counting, the SEC has subjected Mr. Musk to unrelenting investigation. In September 2018, the SEC brought actions for securities fraud against Mr. Musk and Tesla regarding statements Mr. Musk made on his Twitter account.  *SEC v. Musk*, 1:18-cv-8865 (S.D.N.Y.), Dkt. No. 1; *SEC v. Tesla*, 1:18-cv-8947 (S.D.N.Y.), Dkt. No. 1.  To resolve the charges, the SEC effectively forced Mr. Musk to sign a consent decree that curtailed Mr. Musk's freedom to communicate with the public by requiring a Tesla securities lawyer to pre-approve his public communications on a range of subject matters—despite the obvious First Amendment implications of that restriction and a sheer lack of evidence that Mr. Musk had violated the securities laws.  *SEC v. Musk*, 1:18-cv-8865 (S.D.N.Y.), Dkt. Nos. 6, 46.  Mr. Musk has repeatedly sought relief from this unconstitutional judgment and continues to assert his right to speak freely.  *See id.*, Dkt. No. 70; *SEC v. Musk*, No. 22-1291, 2023 WL 3451402 (2d Cir. May 15, 2023).

The SEC, for its part, has been apparently unconcerned with infringing on core rights.  Just months after Mr. Musk entered into the consent decree, the SEC ran to court, seeking to have Mr. Musk held in contempt for a tweet he allegedly made without pre-approval.  The court denied the

SEC's motion. *SEC v. Musk*, 1:18-cv-8865 (S.D.N.Y.), Dkt. Nos. 18, 39, 48. In February 2023, a jury vindicated Mr. Musk in a private securities action by finding he had not broken the law, *see In re Tesla Inc. Sec. Litig.*, No. 18-CV-04865-EMC, Dkt. No. 671 (N.D. Cal. Feb. 3, 2023) (jury verdict finding Mr. Musk not liable for Rule 10b-5 claims), but the Commission's unconstitutional consent decree remains.

Apparently unsatisfied with extracting a consent decree, the Commission forged ahead, opening one investigation after another into Mr. Musk and companies connected to him. Attorney Declaration of Alex Spiro ("Spiro Decl."), ¶¶ 11–14. For example, the same day the Commission closed the investigation into Mr. Musk's 2018 tweet, it opened a new investigation into SpaceX. Spiro Decl. ¶ 12. The Commission has issued dozens upon dozens of subpoenas over the years, imposing burdensome compliance costs on Mr. Musk and related entities without ever charging Mr. Musk with violating the law. Spiro Decl. ¶ 11.

The Commission has also resorted to dirty tactics. In 2022, when Mr. Musk sought relief in the Southern District of New York from the Commission's harassment, at least one member of the SEC staff responded by leaking to the press certain information regarding its investigation. *See SEC v. Musk*, 1:18-cv-8865, Dkt. No. 71, Motion n.4 (S.D.N.Y. Mar. 8, 2022). The SEC has never denied it was responsible for the leak. Spiro Decl. ¶ 13.

In April 2022, the Commission launched an investigation into certain SEC filings Mr. Musk made in connection with his purchase of Twitter stock earlier that year. Spiro Decl. ¶ 14. Rule 13d-1 requires that certain disclosures be filed with the SEC when an individual acquires more than 5% of a publicly traded company's stock. *See* 17 C.F.R. § 240.13d-1. A Schedule 13G form must be filed within 10 days once more than 5% of a company's stock is acquired and may only be filed by a "passive" investor, i.e., a person who "[h]as not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer." 17 C.F.R. § 240.13d-1(c). If the person is not a passive investor, a Schedule 13D must be filed instead. *Id.* As the Supreme Court has explained, the "purpose of the [Section 13(d) disclosures] is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party." *Rondeau v.*

*Mosinee Paper Corp.*, 95 S. Ct. 2069, 2075–76 (1975).  "Congress intended to do no more than give incumbent management an opportunity to express and explain its position."  *Id.* (holding that a private litigant must show irreparable harm to obtain injunctive relief where a corporation alleged the respondent's three-month delay in filing a Section 13 disclosure harmed its efforts to respond to petitioner's potential to control the company).

On April 4, 2022, Mr. Musk disclosed his acquisitions of Twitter stock with a Schedule 13G form.  Ex. 1, Apr. 4, 2022 Schedule 13G.  On April 5, 2022, he filed a Schedule 13D form.  Ex. 2, Apr. 5, 2022 Schedule 13D.  On April 4, 2022, the same day as Mr. Musk's Schedule 13G filing, the SEC's Division of Corporation Finance sent Mr. Musk an inquiry about the filing.  Spiro Decl. ¶ 14.  Shortly thereafter, the Enforcement Division intervened so that the same individuals investigating Mr. Musk's compliance with the 2018 consent decree could also run the present investigation. *Id.*

On April 17, 2022 the SEC's Director of the Division of Enforcement Gurbir Grewal issued an Order Directing Private Investigation and Designating Officers to Take Testimony (the "Formal Order") regarding whether Mr. Musk properly filed the Schedules 13D and 13G, and whether he may have violated Section 10(b) of the Exchange Act and Rule 10b-5 in connection with his acquisitions of Twitter stock.  Ex. 3, Formal Order.  Additionally, the Formal Order purportedly empowered SEC counsel Robin Andrews and other staff ("the Enforcement Staff") to issue subpoenas and other discovery demands.  Attorney Declaration of Robin Andrews ("Andrews Decl."), ¶ 5(i)-(ii).

Although the SEC routinely resolves similar untimely filings by imposing a fine, the Commission's investigation into Mr. Musk's purportedly untimely Schedule 13 filings rages on eighteen months later. *See, e.g.*, *In the Matter of Norman M.K. Louie and Mount Kellett Capital Management LP*, *Respondents.*, Release Nos. 83637; 4968 (July 16, 2018), *available at* https://www.sec.gov/litigation/admin/2018/34-83637.pdf (imposing $100,000 fine on hedge fund that failed to timely file a Schedule 13D for approximately 45 days after it had previously filed a 13G); *In the Matter of WCAS Mgmt. Corp., Respondent.*, Release No. 89914 (Sept. 17, 2020), *available at* https://www.sec.gov/files/litigation/admin/2020/34-89914.pdf (imposing $100,000

fine on private equity firm that failed to file an amended Schedule 13D for approximately two months); *In the Matter of Lawrence I. Rosen, Respondent.*, Release No. 98545 (Sept. 27, 2023), *available at* https://www.sec.gov/files/litigation/admin/2023/34-98545.pdf (imposing $150,000 fine on individual who failed to timely file various Schedule 13Gs up to a year late); *In the Matter of Joseph Theodore Lukens, Jr., Respondent.*, Release No. 98542, (Sept. 27, 2023), *available at* https://www.sec.gov/files/litigation/admin/2023/34-98542.pdf (imposing $120,000 fine on individual who failed to timely file various Schedule 13D amendments).  Here, however, the SEC has issued 32 administrative subpoenas, Spiro Decl. ¶ 15, and counsel has produced hundreds of pages of documents.  Andrews Decl. ¶ 7.  Mr. Musk alone has received five document subpoenas and three testimony subpoenas.  Spiro Decl. ¶ 15.  The Commission's intrusive and overly broad discovery demands have sought, *inter alia*, all of Mr. Musk's emails relating to the Twitter merger through August 2022 and the testimony of multiple individuals who had no role in the Schedule 13 filings at issue.  *Id.*  And the SEC has given no indication when this pattern will abate.

As part of its sprawling investigation, the Commission has taken testimony from Mr. Musk and at least three other individuals a combined seven times.  *Id.*  On July 12, 2022, the Commission took Mr. Musk's testimony via WebEx for approximately four hours regarding, *inter alia*, Mr. Musk's purchases of Twitter stock in 2022, discussions with Mr. Musk's wealth manager regarding SEC filing requirements, Mr. Musk's Schedule 13G filing and subsequent Schedule 13D amendment, and discussions about joining Twitter's board.  Spiro Decl. ¶ 17.  After the Commission attempted to question Mr. Musk about conduct beyond the scope of the Formal Order, counsel objected at the testimony and in writing that "the Formal Order of Investigation is clear on its face that the Commission is only authorized to investigate conduct 'from at least March 24, 2022 to April 5, 2022,'" not thereafter.  Ex. 4, July 13, 2022 Letter.  Consequently, the Commission issued a corrected Formal Order (the "Corrected Formal Order") covering all conduct since March 24, 2022.  Ex. 5, Corrected Formal Order.  On July 27, 2022, the Commission took Mr. Musk's testimony for a second remote, approximately four-hour session regarding, *inter alia*, another Schedule 13D Amendment and his acquisition of Twitter.  Spiro Decl. ¶ 18.  On June 1, 2022, the SEC took testimony from Mr. Musk's wealth manager via WebEx regarding SEC filing requirements in

connection with the purchase of Twitter shares, his role in preparing the Schedules 13G and 13D, and his reliance on advice from counsel. Spiro Decl. ¶ 16. On September 15, 2022, the SEC took testimony from Mr. Musk's wealth manager a second time for approximately four hours via WebEx regarding, *inter alia*, the Schedule 13 filings and Mr. Musk's acquisition of Twitter. Spiro Decl. ¶ 19. And, finally, on Monday, October 30, 2023, the Commission took testimony from Mr. Musk's wealth manager remotely a third time for approximately four hours. Spiro Decl. ¶ 21.

Despite having already taken the testimony of Mr. Musk, his wealth manager, and others, on May 23, 2023, the Commission served a third testimony subpoena on Mr. Musk compelling him to testify in person on September 13, 2023 at the SEC's San Francisco Regional Office. Dkt. No. 2-2, SEC Ex. 2, May 23, 2023 Subpoena. Counsel agreed to accept service of the Commission's subpoena via email, but did not consent or concede that the Commission had the authority to compel Mr. Musk's attendance. Spiro Decl. ¶ 20. The testimony was subsequently rescheduled to September 15, 2023. Dkt. No. 2-3, SEC Ex. 3, Aug. 28, 2023 Subpoena.

On September 13, 2023, counsel objected in writing to the testimony. *First*, counsel objected because it is unclear what additional relevant information the Commission seeks to obtain from a third testimony in an investigation concerning an allegedly days-late Schedule 13 filing. *Second*, counsel objected to having the testimony conducted in-person in San Francisco when Mr. Musk resides in Texas. *Third*, counsel objected that the Commission is exercising its subpoena power in bad faith to harass Mr. Musk. *Fourth*, counsel objected it needed time to review information revealed in a recently published 600-page biography of Mr. Musk. Dkt. No. 2-4, SEC Ex. 4, Sept. 13, 2023 Letter. In the SEC's October 30, 2023 interview with Mr. Musk's wealth manager, the Commission questioned him about an excerpt from Mr. Musk's biography, which the witness testified he had not read in its entirety. Spiro Decl. ¶ 21.

In response, the Commission stated that it needed to take Mr. Musk's testimony yet again because additional documents had been produced (per subpoenas post-dating Mr. Musk's last testimony) and the Staff had more questions about Mr. Musk's disclosures of his Twitter shares and public statements relating to Twitter in April and May 2022. The Commission also claimed its "investigation involves more than just the timing and substance of a single Schedule 13 filing" but

also "a number of such filings by [Mr. Musk] in April and May 2022, as well as a number of public statements about the Twitter transaction." Dkt. No. 2-5, SEC Ex. 5, Sept. 14, 2023 SEC Letter. The Commission subsequently offered several dates in October and November to take Mr. Musk's testimony in Fort Worth, Texas, roughly 200 miles away from Mr. Musk's Austin, Texas residence. Dkt. No. 2-7, SEC Ex. 7, Sept. 21, 2023 SEC Letter.

Counsel replied, informing the Commission that, in light of the Commission's pattern of harassment of Mr. Musk including the "leak of information to the mainstream media, the opening of a frivolous investigation the day after it closed an earlier investigation, and the litany of subpoenas" issued in this matter, Mr. Musk would not appear for the testimony. Dkt. No. 2-8, SEC Ex. 8, Sept. 24, 2023 SEC Letter. The Commission responded the next day with a letter informing counsel that it would seek "appropriate judicial relief" if Mr. Musk does not reconsider his decision not to appear for testimony. Dkt. No. 2-9, SEC Ex. 9, Sept. 25, 2023 SEC Letter. The following week the SEC filed the instant action seeking to compel compliance with its administrative subpoena.

## LEGAL STANDARD

Administrative subpoenas from the SEC are not self-enforcing. *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 741 (1984). Because "[i]t is the court's process which is invoked to enforce the administrative summons[,] a court may not permit its process to be abused." *United States v. Powell*, 379 U.S. 48, 58 (1964). The SEC bears the burden to show that it (1) has authority to investigate; (2) satisfied all procedural requirements; and (3) that "the evidence [sought] is relevant and material to the investigation." *FDIC v. Garner*, 126 F.3d 1138, 1142 (9th Cir. 1997); *see also* Dkt. No. 5 (ordering that "the issues are (1) whether Congress has granted the authority to investigate, (2) whether the procedural requirements have been followed, and (3) whether the evidence is relevant and material to the investigation." (citing *SEC v. Obioha*, No. 12-cv-80109-WHA, 2012 WL 4889286, at *1 (N.D. Cal. Oct. 12, 2012)).

## ARGUMENT

The Commission's application falters at every step of the analysis. The SEC has spent the past eighteen months devoting its formidable resources to investigating Mr. Musk over an allegedly

untimely filing.  This is just the latest chapter in a more-than-five-year saga of agency harassment against Mr. Musk and related entities.  While the details may change, the story stays the same: bad faith investigations conducted by officials acting in clear violation of the Constitution.  The SEC has proceeded in excess of its authority and contrary to law, and its Application should be denied.

## I.     <u>THE SEC'S HARASSMENT OF MR. MUSK EXCEEDS ITS AUTHORITY</u>

The SEC's pursuit of Mr. Musk has crossed the line into harassment, which is quintessential bad faith and "of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).  As the Supreme Court has made clear, "[p]ersons from whom [an agency] seeks relevant information are not required to submit to [the agency's] demand, if in any respect it is unreasonable or overreaches the authority Congress has given." *Oklahoma Press*, 327 U.S. at 217.  This principle applies with even greater force when an agency issues a subpoena to an individual, rather than a corporation. *See Resol. Tr. Corp. v. Walde*, 18 F.3d 943, 948–49 (D.C. Cir. 1994) (recognizing that cases that have permitted "agencies the greatest latitude in seeking the information they deem relevant to their duties . . . involve corporations rather than individuals," and noting that "[t]he Supreme Court reminds us that 'corporations can claim no equality with individuals in the enjoyment of a right to privacy'") (quoting *Morton Salt Co.*, 338 U.S. at 652).  And "while the SEC is entitled to great freedom in conducting its investigations, it is not at liberty to act unreasonably, and in appropriate circumstances the court may inquire into the reasons for an investigation and into its effects." *Brigadoon*, 480 F.2d at 1056.

The SEC's campaign against Mr. Musk is precisely the sort of agency action that courts properly refuse to tolerate.  *See, e.g.*, *Int'l Waste Controls, Inc. v. SEC*, 362 F. Supp. 117, 120 (S.D.N.Y. 1973) (finding jurisdiction to enjoin SEC investigations predicated on allegations that the SEC "has plainly exceeded its statutory authority or threatens irreparable injury in clear violation of an individual's rights").  The Commission's conduct illustrates that the "subpoena [was] not issued in good faith but [instead] to harass or pressure the subject of an investigation," requiring that the "court would be bound not to enforce the subpoena as issued." *Brigadoon*, 480 F.2d at 1056.

1

**A.      This Subpoena Is The Latest In A Long String Of SEC Abuses Of Its**
2         **Investigatory Authority**

3          The SEC's pattern of ceaseless and successive investigations of Mr. Musk demonstrates its

4    bad faith.  In 2018, the Commission brought charges against Mr. Musk for violating the securities

5    laws in connection with a tweet about taking Tesla private.  *SEC v. Musk*, 1:18-cv-8865 (S.D.N.Y.),

6    Dkt. No. 1.  To save the company, Mr. Musk entered into a consent decree to resolve the charges.

7    *SEC v. Musk*, 1:18-cv-8865 (S.D.N.Y.), Dkt. No. 15.   But that came at a high price.   The

8    Commission required that Mr. Musk subject himself to an unconstitutional prior restraint:   pre-

9    approval of his material public communications about Tesla by a Tesla securities lawyer.  *Id.*  That

10   the Constitution forbids the government from conditioning settlement on such a waiver of

11   constitutional rights did not concern the Commission.  Nor did the utter lack of evidence that Mr.

12   Musk had actually violated the securities laws.  Indeed, in 2023 Mr. Musk was vindicated when a

13   jury—after less than two hours of deliberation—found him not liable for violating the very same

14   laws under which the SEC had levied charges for the very same conduct.  *In re Tesla Inc. Sec. Litig.*,

15   No. 18-CV-04865-EMC, Dkt. No. 671 (N.D. Cal. Feb. 3, 2023) (jury verdict finding Mr. Musk not

16   liable for Rule 10b-5 claims).  Yet Mr. Musk remains bound by the prior restraint on his speech.

17          Not content with simply yoking Mr. Musk to an unconstitutional restraint on speech, the

18   SEC soon ran to court seeking to have him held in contempt for a tweet he had not submitted for

19   pre-approval.  *SEC v. Musk*, 1:18-cv-8865 (S.D.N.Y.), Dkt. No. 18.  The court admonished the SEC,

20   Dkt. No. 39, but any lesson the agency might have learned was short-lived.  In the ensuing years,

21   the SEC has opened one investigation after another into Mr. Musk and companies related to him,

22   often targeting its inquiries into his constitutionally protected rights.  Spiro Decl. ¶¶ 11–15.  Indeed,

23   on the same day the Commission closed its investigation into Mr. Musk's 2018 tweet it opened a

24   new investigation into SpaceX, another one of his companies.   Spiro Decl. ¶ 12.   And the

25   Commission is now nearly two years into a new investigation about compliance with the consent

26   decree—this one centered on a tweet merely asking a question about the public's political views,

27   the type of speech meriting the highest degree of First Amendment protection.  *See SEC v. Musk*,

28   1:18-cv-8865 (S.D.N.Y.), Dkt. No. 70, Motion to Quash Certain Portions of SEC Subpoena & to

Terminate Consent Decree.  The Commission has also resorted to foul play, strategically leaking certain information regarding its investigation into Mr. Musk to the public.  Spiro Decl. ¶ 13.

The sheer volume and frequency of the SEC's demands raises an inference that the agency is improperly targeting Mr. Musk, which is only confirmed by the Commissions' apparent bad faith and disregard for limits on its authority.  The pattern of demands relating to Mr. Musk's exercise of his constitutional rights is similarly telling, reflecting the Commission's bottomless appetite for pursuing Mr. Musk.

**B.      This Present Investigation Should Have Concluded A Year Ago**

Mr. Musk continues to be forced to play whack-a-mole with baseless SEC subpoenas in the present investigation.  The SEC is purportedly investigating an allegedly days-late SEC filing, but the investigation meanders on eighteen months later.  Mr. Musk first received a document subpoena for documents concerning the filings, *see* Ex. 6, April 18, 2022 Subpoena to Mr. Musk, and he complied.  Andrews Decl. ¶ 7.  Since then, however, he has received rolling requests for documents bearing little to no connection with the filings.  For example, the Commission has demanded:  "For April 25, 2022 to May 31, 2022, all Communications with potential investors in any entity involved in the Twitter merger, including but not limited to any individuals or entities from whom equity commitments were sought." Ex. 7, Aug. 8, 2022 Subpoena to Mr. Musk; "For April 1, 2022 to August 15, 2022, all Documents and Communications relating to the Twitter Merger," Ex. 8, Sept. 27, 2022 Subpoena to Mr. Musk, and "In the Delaware Court of Chancery matter *Twitter, Inc. v. Elon R. Musk, X Holdings I, Inc., and X Holdings II, Inc*. (2022-0613-KSJM), all deposition transcripts and exhibits," Ex. 9, Sept. 29, 2022 Subpoena to Mr. Musk.  The SEC sent many of these requests to two, three, four, or more individuals and entities.  Spiro Decl. ¶ 15.  Many of these documents post-date the filings by many months, and the SEC has failed to explain how they could possibly be relevant to the timeliness of April filings.

Nevertheless, Mr. Musk produced documents and made himself available for testimony twice.  The Commission has taken Mr. Musk's testimony for nearly nine hours over the course of two days about his acquisition of Twitter stock in 2022, his conversations with Mr. Musk's wealth manager regarding the required SEC disclosures, and discussions about his potentially joining

Twitter's board in April 2022.  In his first testimony, the Staff attempted to exceed the limits of their authority, asking Mr. Musk questions about conduct post-dating the scope of the Formal Order. After counsel objected that "the Formal Order of Investigation is clear on its face that the Commission is only authorized to investigate conduct 'from at least March 24, 2022 to April 5, 2022,'" Ex. 4, July 13, 2022 Letter, the Staff sought additional authorization.  The Director of Enforcement then issued a corrected Formal Order (the "Corrected Formal Order") covering all conduct since March 24, 2022.  Ex. 5, Corrected Formal Order.  On July 27, 2022, the Commission took Mr. Musk's testimony for a second time for approximately four hours regarding another Schedule 13D Amendment and Mr. Musk's acquisition of Twitter.  Spiro Decl. ¶ 18.

The Commission has also taken Mr. Musk's wealth manager's testimony three times, including just last Monday on October 30, 2023.  Other individuals have also been required to sit for testimony.  Spiro Decl. ¶¶ 15, 21.  During at least one of those testimonies, Staff inquired into Mr. Musk's passion for the First Amendment.  Spiro Decl. ¶ 15.  The Staff's misuse of regulatory authority to probe a witness about Mr. Musk's political beliefs and the value he places on his constitutional rights reeks of McCarthyism that has no place in a free country.

Throughout the course of its investigation, the Commission has had more than ample opportunity to discover all potentially relevant information pertaining to this investigation into an allegedly late Schedule 13 filing.  Historically, the SEC has resolved similar late Schedule 13 filings with a modest fine.  *See supra* 4–5 (listing cases where SEC has resolved late Schedule 13 filings with modest fines).  There is no proper reason to compel further testimony in a case about an allegedly late filing that has been investigated to its last breath for well over a year.  *See Morton Salt Co.*, 338 U.S. at 652 (administrative investigation cannot be "of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power"); *Walde*, 18 F.3d at 948–49 (administrative agencies are given less latitude when investigating individuals as opposed to corporations).

The government has failed to identify a single factually analogous case where a court has enforced a third subpoena in a similarly meandering, unbounded investigation into an allegedly

OPPOSITION TO APPLICATION FOR ORDER COMPELLING COMPLIANCE WITH SUBPOENA

days-late SEC filing.[1]  Of the litany of SEC subpoena enforcement actions cited by the government, none involve a late Section 13 filing.  Moreover, none involve a respondent objecting to a third testimony.  *See* Mot. 6–9.  Rather, they involve cases where respondents failed to comply with the Commission's initial subpoena.  *See, e.g.*, *Nelson v. SEC*, No. C08-80080-MISC-(JF)(HRL), 2008 WL 2444794, at *1 (N.D. Cal. June 16, 2008) (respondent refused to comply with an SEC subpoena seeking bank records); *RNR Enters., Inc. v. SEC*, 122 F.3d 93, 95 (2d Cir. 1997) (each respondent refused to comply with SEC subpoena for testimony).  Here, in contrast, Mr. Musk cooperated in good faith with the Commission's many discovery demands, produced hundreds of documents, and appeared for multiple testimony sessions.

Finally, in the cases cited by the Commission, the SEC provided specific cogent reasons why the requested materials were needed to identify a potential securities law violation.[2]  In contrast, here the Commission has failed to explain with specificity why Mr. Musk's testimony is needed yet again or what potential violations may have occurred aside from a late Schedule 13 filing.

### C.    The SEC Misconstrues The Record When In Fact Mr. Musk Timely Objected To The SEC's Unreasonable And Irrelevant Discovery Demands

The Commission misstates the facts to make it appear that Mr. Musk agreed to sit for a third testimony.   No such thing occurred.   While Mr. Musk's counsel accepted service of the

---

[1]    That the Second Circuit did not find the SEC's harassment of Mr. Musk sufficient basis to terminate or modify the consent decree in *SEC v. Musk*, No. 22-1291, 2023 WL 3451402 (2d Cir. May 15, 2023), says nothing about the validity of the present subpoena.  The Second Circuit faced an incomplete record and, in any event, the Commission has doubled down on its pursuit of Mr. Musk since that time.

[2]    *See, e.g.*, *Flatt v. SEC*, No. 10-60073-MC, 2010 WL 1524328, at *4 (S.D. Fla. Apr. 14, 2010) (denied motion to quash an SEC subpoena for respondent's bank records because the SEC asserted it needed the bank records to trace the path of the proceeds of allegedly illegal transactions); *Rosiere v. SEC*, No. 2:09-CV-01975(JCM)(PAL), 2010 WL 489526, at *2 (D. Nev. Feb. 5, 2010) (SEC subpoena of bank records "may help trace the proceeds of possibly illegal transactions for disgorgement and other purposes"); *Gewerter v. SEC*, No. CV-16-02556-PHX-DLR, 2016 WL 4074117, at *2 (D. Ariz. Aug. 1, 2016) (SEC subpoena of bank records needed to trace funds that may have come from a materially false registration statement filed by the respondent); *SEC v. Blackfoot Bituminous, Inc.*, 622 F.2d 512, 513 (10th Cir. 1980) (enforcing subpoena of certain corporate records of respondent relating to their offer and sale to the public of investments in coal lease tax shelter programs).

Commission's administrative subpoena, counsel did not consent to a third testimony or concede that the Commission has the authority to compel it.  Spiro Decl. ¶ 20.  Accepting service of a subpoena does not preclude a party from challenging efforts to enforce that subpoena in court.  *See, e.g.*, *In re Application for Ord. Quashing Deposition Subpoenas*, dated July 16, 2002, No. M8-85, 2002 WL 1870084, at *2 (S.D.N.Y. Aug. 14, 2002) (granting motion to quash Rule 45 subpoena which violated territorial limitations although "the movants ultimately accepted service under protest, without agreeing that service was proper and expressly reserving their rights to challenge those subpoenas").  The Commission's claims to the contrary, *see* Andrews Decl. ¶ 9, are simply wrong.

The Commission further claims that Mr. Musk failed to timely object to a third testimony.  But administrative subpoenas are not self-enforcing and Mr. Musk was under no obligation to assert objections or risk waiver.  *See Jerry T. O'Brien, Inc.*, 467 U.S. at 741.  The Commission also again misconstrues the record.  In fact, Mr. Musk objected to sitting for a third testimony with the SEC and articulated his reasons: 1) it is unclear what additional relevant information the Commission seeks to uncover from a third testimony in this investigation about an allegedly late Schedule 13 filing; 2) the Commission is exercising its subpoena power in bad faith to harass Mr. Musk; 3) the testimony should not be conducted in-person in San Francisco when Mr. Musk resides in Austin, Texas; 4) counsel needed time to review information revealed in a recently published 600-page biography of Musk.  Dkt. No. 2-4, SEC Ex. 4.  As explained in Sections I.A, I.B., *supra* at 9–12, objections one and two raise valid reasons to refuse to enforce a subpoena because administrative agencies lack authority to pursue bad-faith investigations like this one.

Mr. Musk also made a proper objection regarding the location of the testimony.  A court may modify a subpoena to prevent undue burden on a respondent even if the issuing agency has authority to compel attendance at a particular location.  *See Fed. Hous. Fin. Agency v. SFR Invs. Pool 1, LLC*, No. 2:17-CV-00914-GMN-PAL, 2018 WL 1524440, at *8 (D. Nev. Mar. 27, 2018) (narrowing FHFA's document request because it would be unreasonable for the respondent to produce documents from the recorder's office and non-parties); *cf. Dyno Nobel, Inc. v. Johnson*, 586 F. Supp. 3d 657, 662 (E.D. Ky. 2022) (modifying place of compliance for Rule 45 subpoena to comply with 100-mile requirement).  The Commission has twice taken Mr. Musk's testimony

1 remotely by WebEx.  The Commission has provided no reason why Mr. Musk's third testimony

2 must be conducted in person at the agency's Regional Office in San Francisco, California, rather

3 than remotely (as before) or at a location more proximate to Mr. Musk's residence in Austin, Texas.

4 If the Court does not quash the subpoena, at a minimum it should order that Mr. Musk's third

5 testimony be conducted remotely for the convenience of the parties, just as his previous two were.[3]

6 For these reasons, the Court should deny the SEC's application to enforce its subpoena.

7 **II.    THE SEC SEEKS IRRELEVANT AND IMMATERIAL INFORMATION**

8       The subpoena is also unenforceable because it seeks irrelevant and immaterial information.

9 "An administrative subpoena [] may not be so broad so as to be in the nature of a 'fishing

10 expedition.'"  *Peters*, 853 F.2d at 700; *see also Jerry T. O'Brien*, 467 U.S. at 737 (SEC only "has

11 statutory authority to conduct nonpublic investigations into possible violations of the securities laws

12 and, in the course thereof, to issue subpoenas to obtain ***relevant*** information") (emphasis added).

13 Accordingly, an administrative subpoena may not be enforced if "the party being investigated

14 proves the inquiry is unreasonable because it is overbroad or unduly burdensome."  *EEOC v.*

15 *Children's Hosp. Med. Ctr. of N. California*, 719 F.2d 1426, 1428 (9th Cir. 1983) (en banc),

16 *overruled on other grounds as recognized in Prudential Ins. Co. of America v. Lai*, 42 F.3d 1299,

17 1303 (9th Cir. 1994).  A third testimony from Mr. Musk is plainly unduly burdensome.

18       A subpoena imposes an undue burden if it requests information that is already in an agency's

19 possession or threatens to unduly disrupt or seriously hinder a business' normal operations.  *See*

20 *SFR Invs. Pool 1, LLC*, 2018 WL 1524440, at *6, 7.  The Commission has already had multiple

21 opportunities to ask Mr. Musk any questions it might have regarding the filings, and he has produced

22

23 _____

24 [3]     The fourth objection regarding counsel's need to review newly released evidence from Mr.
Musk's biography is similarly valid.  It is perfectly reasonable to reschedule testimony to allow a
25 party to adequately prepare in light of new evidence.  *See Cont'l Assurance Co. v. Lombardo*,
CIV.A. No. 85-4867, 1988 WL 94321, at *1 (E.D. Pa. Sept. 7, 1988) ("because the first depositions
26 of defendants [] occurred in February and March of 1987, it is reasonable to assume plaintiffs needed
some time to review documents and any new evidence gathered over the intervening year [to retake
27 their depositions]").  This objection proved prescient when this last Monday the Commission
questioned Mr. Musk's wealth manager about an excerpt from Mr. Musk's biography, which he
28 testified he had not read in its entirety.  Spiro Decl. ¶ 21.

hundreds of documents in response to its requests.  As discussed *supra* at 10, the Commission's overbroad subpoenas demanded all communications relating to the Twitter acquisition (even postdating the Schedule 13 filings), all communications with potential co-investors for a similarly overbroad time period, and all deposition transcripts from the Delaware Court of Chancery action relating to the Twitter acquisition, which did not even commence until several months after the purportedly untimely filing took place.  *Twitter, Inc. v. Musk*, No. 2022-0613-KSJM, Dkt. No. 1 (Del. Ch. July 12, 2022).  Moreover, the Commission has already taken testimony from Mr. Musk for over eight hours, from his wealth manager *three times* for a total of approximately 12 hours, and from at least two other people who had no connection to the Section 13 filings.

Although the Commissions claims it needs to question Mr. Musk regarding additional documents that have been produced, it fails to mention that it waited until after Mr. Musk's first two testimonies to request these documents.  The Commission provides no reason why it could not have more timely subpoenaed the documents and asked its questions in either of the previous two testimonies.  The SEC should not be permitted to persist in this pattern of continuing to ask for documents and then more testimony, over and over again.  In any event, there is no further relevant information to uncover in a third testimony.

Thus, the Commission's subpoena for a third testimony of Mr. Musk imposes an undue burden and should not be enforced.  *See Peters*, 853 F.2d at 700 (reversing district court and quashing overly broad subpoena).  The Commission's investigation has become an unlawful "fishing expedition" and it falls to courts to check such governmental abuses, as they have in the past. *See generally United States v. Fensterwald*, 553 F.2d 231, 232 (D.C. Cir. 1977) (authorizing limited discovery in light of allegations of agency bad faith); *Int'l Waste Controls*, 362 F. Supp. at 120 (finding jurisdiction to enjoin SEC investigations predicated on allegations that the SEC "has plainly exceeded its statutory authority or threatens irreparable injury in clear violation of an individual's rights").  This Court should follow suit and deny the application.

## III.   ENFORCEMENT OF THE SUBPOENA WOULD VIOLATE THE CONSTITUTION

The subpoena is also unenforceable for the independent reason it was issued via procedures that violate the Constitution.  Under Article II, only a properly appointed officer who is subject to

1  appropriate presidential supervision may exercise authority of the type entrusted to the SEC

2  Enforcement staff in this case.  But the SEC staff member who issued the subpoena to Mr. Musk

3  was neither appointed in conformance with the Appointments Clause nor removable by the President

4  through the mechanisms required by Article II.  The subpoena is accordingly invalid, and the SEC's

5  application should be denied for either of those alternative reasons.

6  **A.  The Appointments Clause Does Not Permit Issuance Of The Subpoena By A SEC Enforcement Staff Member**

7

8  The Appointments Clause requires that officials exercising significant government authority

9  pursuant to law be appointed in one of several prescribed ways.  Because the SEC staff member

10  who issued the subpoena to Mr. Musk was not appointed in any of those ways, the subpoena is

11  invalid and cannot be enforced.

12  **1.  The Appointments Clause Provides The Exclusive Method For Appointing Government Officials Who Exercise Significant Government Authority Pursuant To Law**

13

14  Under the Appointments Clause, all "Officers of the United States" must be appointed by

15  the President, with the advice and consent of the Senate, or—in the case of "inferior Officers"—by

16  "the President alone, … the Courts of Law, or … the Heads of Departments."  U.S. Const. art. II,

17  § 2, cl. 2.  Those methods are "the exclusive means of appointing 'Officers.'"  *Lucia*, 138 S. Ct. at

18  2051.  And conforming to them is "more than a matter of 'etiquette or protocol'; it is among the

19  significant structural safeguards of the constitutional scheme."  *Edmond v. United States*, 520 U.S.

20  651, 659 (1997).  Compliance with the Appointments Clause ensures that "the President remains

21  responsible for the exercise of executive power—and through him, the exercise of executive power

22  remains accountable to the people."  *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1988 (2021);

23  *see, e.g.*, *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 884 (1991) ("The Framers

24  understood … that by limiting the appointment power, they could ensure that those who wielded it

25  were accountable to political force and the will of the people.").

26  The Constitution does not define the term "Officers."  But the term has long been understood

27  to refer to public officials who "exercis[e] significant authority pursuant to the laws of the United

28  States," *Lucia*, 138 S. Ct. at 2051 (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)),

and "hold a continuing office established by law," *id.* at 2052; *see Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 76–115 (2007).  Public officials who do not fall into that category are "simply employees of the federal government" whose appointments need not comply with the Appointments Clause.  *Lucia*, 138 S. Ct. at 2051; *see Buckley*, 424 U.S. at 126 n.162 (describing non-officers as "lesser functionaries").

The Supreme Court's decision in *Lucia*, which also involved officials at the SEC, illustrates that distinction and is highly relevant here.  In a majority opinion by Justice Kagan, the Court held that SEC ALJs are inferior officers—rather than employees—because their powers to issue subpoenas, administer oaths, examine witnesses, and issue an initial decision give them significant authority pursuant to a continuing position created by statute.  138 S. Ct. at 2049, 2051–54.  And because the SEC ALJs were appointed by "SEC staff members" rather than any of the actors named in the Appointments Clause, the Court held that the ALJ's appointment was unconstitutional.  *Id.* at 2051.  To remedy the constitutional violation, the Court determined that the subject of the SEC proceeding was entitled a new hearing before a new, properly appointed ALJ.  *Id.* at 2054–55.

### 2. The Issuance Of An Administrative Subpoena Constitutes The Exercise Of Significant Government Authority Subject To The Appointments Clause

Under *Lucia* and other relevant precedent, SEC Enforcement Staff who exercise statutory authority to issue administrative subpoenas as part of conducting enforcement investigations are inferior officers subject to the Appointments Clause.[4]

*First*, issuance of an administrative subpoena as part of an SEC enforcement investigation is an exercise of "significant [government] authority pursuant to the laws of the United States." *Lucia*, 138 S. Ct. at 2051 (quoting *Buckley*, 424 U.S. at 126).  It is well-established that such prosecutorial actions represent a paradigmatic exercise of the "sovereign power of the United States," *United States v. Providence Journal Co.*, 485 U.S. 693, 700 (1988), and therefore can be performed only by an officer appointed pursuant to the Appointments Clause, *see, e.g.*, *Morrison v.*

---

[4]   Like *Lucia*, this case does not implicate the distinction between inferior officers and principal officers or the narrower constitutional mechanisms for appointing the latter.  138 S. Ct. at 2051 n.3.

1   *Olson*, 487 U.S. 654, 671 & n.12 (1988) (independent counsel is an officer); *Myers v. United States*,

2   272 U.S. 52, 159 (1926) (U.S. attorney is an officer); *United States v. Donziger*, 38 F.4th 290, 296–

3   99 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 868 (2023) (special prosecutor is an officer); *In re Grand*

4   *Jury Investigation*, 315 F. Supp. 3d 602, 627 (D.D.C. 2018), *aff'd*, 916 F.3d 1047 (D.C. Cir. 2019)

5   (similar); *see also* 28 U.S.C. § 542 (providing that the Attorney General—the head of a

6   department—may appoint assistant United States Attorneys).  And issuing subpoenas is not all that

7   the SEC staff here are empowered to do; they may "administer oaths and affirmations … compel

8   [witnesses'] attendance, take evidence, and require the production of … records deemed relevant or

9   material to the inquiry, and to perform all other duties in connection therewith as prescribed by law."

10  Ex. 3, Formal Order; Ex. 5, Corrected Formal Order.  Conferring such an arsenal of prosecutorial

11  powers upon the SEC staff undoubtedly qualifies them for officer status.

12       *Second*, the Enforcement Staff hold a continuing office established by law.  *Lucia*, 138 S. Ct.

13  at 2052.  They are hired pursuant to a federal statute providing that the "Commission may appoint

14  and fix the compensation of such officers, attorneys, economists, examiners, and other employees

15  as may be necessary for carrying out its functions under the securities laws."  5 U.S.C. § 4802(b);

16  *see* 17 C.F.R. § 200.10 ("The Commission is assisted by a staff, which includes lawyers,

17  accountants, engineers, financial security analysts, investigators, and examiners, as well as

18  administrative and clerical employees.").  Thus, just as SEC ALJs hold a "continuing" office

19  because their position is created by statute, so too do the Enforcement Staff.  *Compare Lucia*, 138

20  S. Ct. at 2053 (SEC ALJs hold a "continuing office" because they hold a position created by statute),

21  *with United States v. Germaine,* 99 U.S. 508, 510, 511–12 (1878) (doctors hired to perform physical

22  exams are not officers because their duties were "occasional or temporary" rather than

23  "continuing").

24       Accordingly, the Enforcement Staff are inferior officers.  Indeed, the Enforcement Staff

25  appear to agree.  They represented—on the face of the subpoena—themselves as officers of the SEC

26  authorized to issue the subpoena.  Dkt. No. 2-2 at 2, SEC Ex. 2, May 23, 2023 Subpoena (stating,

27  "I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in

28  this matter," below Mr. Andrews' signature).  And the authorizing statutory provisions under which

OPPOSITION TO APPLICATION FOR ORDER COMPELLING COMPLIANCE WITH SUBPOENA

SEC formal orders are issued—*e.g.*, Section 19(c) of the Securities Act and Section 21(b) of the Securities Exchange Act—require investigations to be conducted either by one of the commissioners or by an inferior officer designated by the commission for that purpose.  *See* 15 U.S.C. §78u(b) ("For the purpose of any such investigation, or any other proceeding under this chapter, any member of the Commission or any officer designated by it is empowered…"); 15 U.S.C. § 77s(c) (substantively same).

### 3.    The SEC Staff Who Issued The Subpoena Are Unconstitutionally Appointed

To exercise the powers of an inferior officer as attempted in this case, an SEC Enforcement Staff member must be appointed by "the President alone, [] the Courts of Law, or [] the Heads of Departments."  U.S. Const. art. II, § 2, cl. 2.  Those methods are "exclusive."  *Lucia*, 138 S. Ct. at 2051.  But the Enforcement Staff were appointed by none of the above.  Rather, they were appointed by the Director of the SEC Division of Enforcement, pursuant to a purported delegation by the Commission. Ex. 3, Formal Order; Ex. 5, Corrected Formal Order; *see* 17 C.F.R. § 200.30-4(a)(1).

The Director of the SEC Enforcement Division, however, is not the President, a court of law, or the head of a department.  While the SEC itself is considered a department, its "head" is undisputedly the Commissioners—not the Director of the Enforcement Division.  *Free Enter. Fund*, 561 U.S. at 510–512; *see Lucia*, 138 S. Ct. at 2051 n.3.  And the Commissioners cannot delegate their Appointments Clause authority to the Director of the Enforcement Division or any other subordinates.  As the Department of Justice's Office of Legal Counsel has explained, "the power to appoint inferior officers … may be delegated *only to officials identified by the Appointments Clause as competent to appoint inferior officers*."  *Appointment & Removal of Fed. Rsrv. Bank Members of the Fed. Open Mkt. Comm.*, 2019 WL 11594453, at *12 (Oct. 23, 2019) (emphasis added).

The Court's decision in *Lucia* confirms that understanding.  There, the Court rejected the SEC's mechanism for delegating ALJ appointment authority to "staff members, rather than the Commission proper."  *Lucia*, 138 S. Ct. at 2049; *see id.* at 2058 (Breyer, J., concurring in part) (describing the Commission's attempt "to delegate its power to appoint its administrative law judges to its staff"); Gov't Br. at 3, *Lucia*, *supra* (No. 17-130) (noting that the SEC's ALJs "were selected

by its Chief ALJ … on the exercise of authority delegated by the Commission"); *see also Arthrex*, 141 S. Ct. at 1978–79 (the "President is responsible for the actions of the Executive Branch and cannot delegate [that] ultimate responsibility or the active obligation to supervise that goes with it") (cleaned up).  Accordingly, 17 C.F.R. § 200.30-4 is invalid and so are the Formal Orders and subpoenas issued pursuant to it.

### 4.        The Subpoena Is Accordingly Improper

Parties facing government enforcement efforts are entitled to "relief sufficient to ensure that [the enforcement efforts] to which they are subject will be" conducted by officers appropriately "accountable to the Executive."  *Free Enter. Fund*, 561 U.S. at 513; *see Ryder v. United States*, 515 U.S. 177, 182–183 (1995) ("[o]ne who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case" is entitled to relief).  Because the Enforcement Staff in this investigation were not properly appointed, the subpoenas cannot be constitutionally enforced.  The appropriate remedy for a proceeding that has been "tainted with an appointments violation is a new" proceeding conducted by "a properly appointed" official, and not the Staff presently investigating this matter.  *Lucia*, 138 S. Ct. at 2055; *see Cody v. Kijakazi*, 48 F.4th 956, 961–62 (9th Cir. 2022) (a hearing before a new ALJ is the proper remedy after a hearing before an improperly appointed ALJ).  As such, the SEC's application to enforce the subpoena should be denied, and any new subpoena it seeks to enforce must be issued by a properly appointed officer.

### B.        Enforcement Division Staff Are Unconstitutionally Shielded From Removal

The subpoena is independently defective because the Enforcement Staff are improperly protected from presidential removal in violation of the requirements of Article II.

Through both its vesting of "[t]he executive Power" in the President and its direction that the President "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 1, cl. 1; *id.*, § 3, Article II confers on the President "the general administrative control of those executing the laws, including the power of appointment and removal of executive officers," *Myers*, 272 U.S. at 164; *see, e.g.*, *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S.Ct. 2183, 2198 (2020) ("Since 1789, … the Constitution has been understood to empower the President to keep … officers accountable— by removing them from office, if necessary.") (quoting *Free Enter. Fund*, 561 U.S. at 483).  Under

current Supreme Court precedent, Congress may cabin the President's removal authority in certain limited ways, including by imposing for-cause removal requirements with respect to the heads of certain multi-member agencies. *See Humphrey's Executor v. United States*, 295 U.S. 602, 624 (1935).[5]  Critically for present purposes, however, executive officers may not be subject to *two* layers of for-cause protection against presidential removal authority. *Free Enterp. Fund*, 561 U.S. at 483; *see Seila Law*, 140 S. Ct. at 2198.  Thus, in *Free Enterprise Fund*, the Court invalidated a statutory provision directing that members of the Public Company Accounting Oversight Board (PCAOB) could be removed by the SEC only for certain limited forms of wrongdoing, *see* 15 U.S.C. § 7217(d)(3), given that (according to the Government's concession) SEC Commissioners themselves could be removed only for "inefficiency, neglect of duty, or malfeasance in office," 561 U.S. at 487 (citation omitted).  The Court determined that the combined effect of those restrictions, which resulted in the PCAOB's exercise of executive authority without sufficiently meaningful presidential oversight, had caused a constitutionally impermissible "diffusion of accountability." *Id*. at 497; *see id*. at 495–508.

So too here.  The statutory scheme at issue provides SEC staff with at least two, and potentially more, levels of protection against presidential removal authority.  First, as the Government has acknowledged, SEC Commissioners cannot be removed by the President except for "inefficiency, neglect of duty, or malfeasance in office." *Free Enter. Fund*, 561 U.S. at 487. Second, SEC staff also cannot be removed at will.  That is because 5 U.S.C. § 4802 requires the SEC to comply with the merit system principles, which, in turn, provide various protections against removal at will to all its employees, including the director of enforcement. *See generally* 5 U.S.C. §§ 2301-2302.  In addition, SEC staff are protected by a collective bargaining agreement between

---

[5]  *Humphrey's Executor* has been subject to emphatic and persuasive criticism for many decades. *See, e.g.*, *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 194 n.18 (D.C. Cir. 2018) (Kavanaugh, J., dissenting) (collecting examples).  The Government itself has taken the position that *Humphrey's Executor* should be overruled in a case where it cannot be distinguished.  *See* Br. for Respondent at 44–46, *Seila Law*, *supra* (No. 19-7).  And the Court has expressly declined to extend the reasoning of the decision.  *See Seila Law LLC*, 140 S. Ct. at 2199, 2206.  Mr. Musk reserves the right to ask the Supreme Court to overrule *Humphrey's Executor* in this litigation.  But doing so is not necessary to invalidate the subpoena, for the reasons explained in this section.

their union and the commission. *See* SEC Union, Collective Bargaining Agreement (NTEU Chapter 293 Authorized Version), https://www.secunion.org/collective-bargaining-agreement-nteu-chapter-293-authorized-version.  SEC staff therefore enjoy at least two layers of good-cause protection from the President, which is impermissible for the same reasons that led the Court to invalidate the removal provisions at issue in *Free Enterprise Fund*.  The Fifth Circuit recently reached the same conclusion in striking down the removal protections for SEC ALJs in a decision that is now pending before the Supreme Court.  *See Jarkesy*, 34 F.4th at 463.

Since the SEC enforcement staff are unconstitutionally shielded from the President's removal power under two layers of for-cause protection, the Commission's application to enforce the subpoena should be denied, and any new subpoena it seeks to enforce must be issued by a properly appointed officer.  When an unconstitutional restriction on the President's removal power occurs during an ongoing investigation, litigants are entitled to relief "sufficient to ensure that the [agency actions] to which they are subject will be enforced only by a constitutional agency accountable to the Executive."  *Free Enter. Fund*, 561 U.S. at 513.  Here, the appropriate relief is straightforward:  the SEC's application to enforce the subpoena should be denied.[6]

## IV.   THE COURT SHOULD STAY THIS PROCEEDING PENDING THE SUPREME COURT'S RESOLUTION OF *JARKESY*

In the alternative, the Court should stay further proceedings in this matter until the Supreme Court issues a decision on the constitutionality of the double for-cause removal protections for SEC ALJs in *Jarkesy*.[7]  Staying this matter pending the outcome of the Supreme Court's *Jarkesy* decision

---

[6]  Determining the appropriate remedy when a litigant seeks *retrospective* relief (*e.g.*, vacatur of a judgment) based on actions taken by an officer who was shielded by unconstitutional removal protections is more complex.  *See Collins v. Yellen*, 141 S. Ct. 1761, 1789 (2021).  But here, Mr. Musk is seeking only denial of the SEC's application to compel enforcement of the subpoena.  Courts have held that *prospective* relief is appropriate under such circumstances.  *See, e.g.*, *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 592 F. Supp. 3d 568, 587 (E.D. Tex. 2022) (citing *Free Enter. Fund*, 561 U.S. at 491 n.2, 513).

[7]  The Fifth Circuit in *Jarkesy* separately held that the defendants in an SEC in-house proceeding were deprived of their Seventh Amendment right to a civil jury and that Congress unconstitutionally delegated legislative power to the SEC without providing an intelligible principle in allowing the

is the most efficient and fair course of action for the parties.  *See Mediterranean Enters. Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983) (a court "may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case").  In determining whether to issue a stay, a court must weigh the following: "[1] the possible damage which may result from the granting of a stay, [2] the hardship or inequity which a party may suffer in being required to go forward, and [3] the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962).  Given that the Supreme Court's upcoming decision may very well remake the landscape of administrative law and removal restrictions as it pertains to the SEC, the Court should exercise its broad discretion here to issue a stay pending the resolution of *Jarkesy*.  *See, e.g.*, *Amini v. AUS Mktg. Rsch. Sys., Inc.*, No. SA-CV-15-1270(AG)(JCGx), 2016 WL 7647690, at *2 (C.D. Cal. Feb. 26, 2016) (issuing stay pending the Supreme Court's decision in *Spokeo, Inc. v. Robins*, 578 U.S. ___ (2016)); *O'Hanlon v. 24 Hour Fitness USA, Inc.*, No. 15-CV-01821-BLF, 2016 WL 815357, at *4 (N.D. Cal. Mar. 2, 2016) (same). *Cf. Calcutt v. Fed. Deposit Ins. Corp.*, 37 F.4th 293, 307–08 (6th Cir. 2022), *cert. granted*, *opinion rev'd on other grounds*, 143 S. Ct. 1317 (2023) (FDIC Board stayed its case pending the Supreme Court's decision in *Lucia* because its ALJ had not been appointed by an agency head).

## CONCLUSION

Because the subpoena (1) exceeds the SEC's authority to investigate; (2) is overly burdensome and seeks irrelevant evidence; and (3) was issued via procedures that violated the Constitution, the Commission's application to enforce the subpoena should be denied.  In the alternative, the Court should stay this proceeding pending the Supreme Court's decision in *Jarkesy*.

---

Commission to bring enforcements within the agency or in federal court. *See Jarkesy*, 34 F.4th at 465–66.  Both of those holdings are before the Supreme Court as well.

Dated: November 2, 2023

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*/s/ Alex Spiro*
Alex Spiro (*pro hac vice*)
51 Madison Ave, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
alexspiro@quinnemanuel.com

Christopher G. Michel (*pro hac vice*)
Rachel G. Frank (California Bar No. 330040)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538 8000
Facsimile: (202) 538 8100
christophermichel@quinnemanuel.com
rachelfrank@quinnemanuel.com

*Attorneys for Elon Musk*

\* \* \* \* \*

OPPOSITION TO APPLICATION FOR ORDER COMPELLING COMPLIANCE WITH SUBPOENA