MELISSA ARMSTRONG (Tex. Bar No. 24050234)
ArmstrongMe@sec.gov
100 F Street, NE
Washington, DC 20549
Telephone: (202) 551-4724
Facsimile: (703) 772-9292

MONIQUE WINKLER (Cal. Bar No. 213031)
BERNARD B. SMYTH (Cal. Bar No. 217741)
SmythB@sec.gov
ROBIN ANDREWS (Ill. Bar No. 6285644)
AndrewsR@sec.gov
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

Attorneys for Applicant
Securities and Exchange Commission

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

SECURITIES AND EXCHANGE COMMISSION,

Applicant,

v.

ELON MUSK,

Respondent.

Case No. 3:23-mc-80253-LB

**SECURITIES AND EXCHANGE COMMISSION'S REPLY IN SUPPORT OF ITS APPLICATION FOR AN ORDER COMPELLING COMPLIANCE WITH AN ADMINISTRATIVE SUBPOENA**

**TABLE OF CONTENTS**


I. INTRODUCTION .......... 1

II. MUSK'S TESTIMONY IS PLAINLY RELEVANT TO A LEGITIMATE INVESTIGATIVE PURPOSE .......... 2

A. Musk misrepresents the scope of the SEC's investigation in an effort to obscure the relevance of additional testimony .......... 3

B. The existence of other SEC investigations of a Musk-related company is not evidence of harassment or bad faith .......... 5

C. Musk's objection related to the September 2023 biography both undermines his other arguments and is now entirely moot .......... 6

D. The duration of this investigation is in part a result of the SEC staff's patience and reasonableness with Musk .......... 7

E. The timing and nature of Musk's objections suggest gamesmanship .......... 8

III. THE SEC'S SUBPOENA COMPLIES WITH THE U.S. CONSTITUTION .......... 9

IV. THERE IS NO BASIS TO STAY THIS APPLICATION .......... 14

V. CONCLUSION .......... 14

# TABLE OF AUTHORITIES

## CASES

*Buckley v. Valeo*, 424 U.S. 1 (1976) .......... 11

*CFPB v. CashCall, Inc.*, 35 F.4th 734 (9th Cir. 2022) .......... 13

*CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174 (2d Cir. 2023) .......... 14

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) .......... 13, 14

*Community Fin. Servs. Ass'n of Am. v. CFPB*, 51 F.4th 616 (5th Cir. 2022) .......... 14

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) .......... 5 n.2

*Edmond v. United States*, 520 U.S. 651 (1997) .......... 10

*EEOC v. Children's Hosp. Medical Center*, 719 F.2d 1426 (9th Cir. 1983) .......... 1 n.1, 3

*Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010) .......... 9, 13

*Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868 (1991) .......... 10, 11

*Lamar v. United States*, 240 U.S. 60 (1916) .......... 12

*Lucia v. SEC*, 138 S. Ct. 2044 (2018) .......... 9, 10, 11, 12

*Morrison v. Olson*, 487 U.S. 654 (1988) .......... 13

*Okla. Firefighters Pension and Ret. Sys. v. Musk*, Civ No. 22-cv-03026 (ALC) (S.D.N.Y.) .......... 6 n.4

*Pampena v. Musk*, Civ No. 22-cv-05937-CRB (N.D. Cal.) .......... 6 n.4

*RNR Enters. v. SEC*, 122 F.3d 93 (2d Cir. 1997) .......... 3

*SEC v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047 (2d Cir. 1973) .......... 1 n.1, 3, 6

*SEC v. Musk,* Case No. No. 22-1291, 2023 WL 3451402 (2d Cir. May 15, 2023) .......... 6 n.3

*SEC v. Obioha,* Case No. 12-80109-WHA, 2012 WL 4889286 (N.D. Cal. Oct. 12, 2012) .......... 2

*SEC v. Rana Research*, 8 F.3d 1358 (9th Cir. 1993) .......... 5 n.2

*Steele v. United States,* 267 U.S. 505 (1925) .......... 11

*United States v. Germaine*, 99 U.S. 508 (1879) .......... 9

*United States v. Hendee*, 124 U.S. 309 (1888) .......... 12

*United States v. Morton Salt Co.,* 338 U.S. 632 (1950) .......... 2 n.2, 3

**REGULATIONS**

17 C.F.R § § 200.30-4(a)(13) .......... 9

**STATUTES**

15 U.S.C. § 78d-1 .......... 9

15 U.S.C. § 78d-2 .......... 9

15 U.S.C. § 78u(b) .......... 9

15 U.S.C. § 78u(c) .......... 11

**OTHER AUTHORITIES**

U.S. Const. Art. II, § 2, Cl. 1 .......... 10

U.S. Const. Art. II, § 2, Cl. 2 .......... 9, 10

Office of Management and Budget, Analytical Perspectives, Budget of the U.S. Government, Fiscal Year 2022, p. 44, Table 5-2 (2021) .......... 10 n.5

SEC Division of Enforcement, Enforcement Manual § 3.2.8 .......... 11

# I. INTRODUCTION

In his Opposition, Musk concedes that: (1) he was properly served with an SEC administrative subpoena calling for his testimony; (2) the subpoena was issued pursuant to a valid SEC Formal Order of Investigation; and (3) he failed to appear for testimony, instead registering objections for the first time two days before his testimony date.

Faced with these undisputed facts, Musk attempts to explain away and distract from his noncompliance through misdirection and hyperbole. First, Musk claims that his testimony cannot be relevant to the SEC's investigation (Opposition at 6, 10) – a claim that depends on a flagrant misrepresentation of the investigation's scope. Musk's relevance arguments also fail because he does not dispute that since his last testimony session the SEC has obtained substantial new evidence and information (from Musk and others), and he admits that his biography contained "new evidence" arising since that time. *Id.* at 14 n. 3.

Second, Musk complains that the SEC's subpoena is part of a harassment campaign against him (*id.* at 8-10) – substantially the same argument previously considered and rejected by the Second Circuit. Musk fundamentally mischaracterizes the record. Each instance of purported harassment he cites is simply a typical investigative step, such as the opening of independent nonpublic investigations and the issuance of administrative subpoenas within the scope of those investigations.

Unsurprisingly, Musk is unable to muster authority in support of his extreme claims. Musk asserts that the facts here present the Court with "a paradigmatic basis for denying an administrative subpoena" (*id.* at 1), but he fails to cite a single case in which a court has refused to enforce an administrative subpoena under remotely comparable circumstances. Musk instead cites several cases for the general proposition that there ***could be*** circumstances under which a court would not enforce an administrative subpoena, but in nearly every case he points to, the court ultimately sided with the agency involved and ***enforced*** the underlying subpoena or other government action.[1] Musk does not cite a single case in which a court,

---

[1] *See, e.g.,* citations to *SEC v. Brigadoon Scotch Distrib.*, 480 F.2d 1047 (2d Cir. 1973); *EEOC v. Children's Hosp. Med. Ctr. of N. Cal.*, 719 F.2d 1426 (9th Cir. 1983); *FDIC v. Garner*, 126 F.3d 1138

Footnote continued on next page

concluding that an administrative subpoena was issued as part of a harassment campaign, declined to enforce that subpoena.

Third, Musk conjures up an unsupported – and wholly unsupportable – constitutional objection to all administrative subpoenas issued by the SEC. *Id.* at 16-22. Musk in effect argues that investigative subpoenas can only be valid if personally signed by individual SEC Commissioners, an outlandish argument for which Musk can cite no precedent.

Finally, Musk grasps for yet another excuse to delay these proceedings even further, asking this Court to postpone ruling until after the *Jarkesy* case is decided by the Supreme Court. *Id.* at 22. *Jarkesy* involves, in Musk's words, "the constitutionality of the double for-cause removal protections for SEC ALJs," which has no relevance whatsoever to the SEC's Application to this Court to enforce a lawfully issued subpoena. *Id.*

## II. MUSK'S TESTIMONY IS PLAINLY RELEVANT TO A LEGITIMATE INVESTIGATIVE PURPOSE

As the Court has recognized, its inquiry here is narrow. Discovery Order (Dkt. No. 5). Musk agrees that that the SEC must only demonstrate three elements for its Application to be granted: (1) Congress has granted the authority to investigate, (2) procedural requirements have been followed, and (3) the evidence sought is relevant and material to the investigation. Opposition at 7 (citing *SEC v. Obioha*, No. 12-cv-80109-WHA, 2012 WL 4889286, at *1 (N.D. Cal. Oct. 12, 2012)). Musk does not dispute the first two elements, conceding the SEC's authority to conduct its investigation, the validity of the Formal Order of Investigation, and his having been properly served with the testimony subpoena.

Musk contests only the third element, that his testimony is relevant to a legitimate investigative purpose. His "harassment" arguments largely boil down to claims of irrelevance: Musk essentially argues that the questions the SEC staff might ask him cannot possibly be relevant to this investigation, and so the SEC staff must be motivated by harassment. But as

---

(9th Cir. 1997); *Int'l Waste Controls, Inc. v. SEC*, 362 F. Supp. 117, 120 (S.D.N.Y. 1973); *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 217 (1946); *United States v. Morton Salt Co.*, 338 U.S. 632 (1950); *United States v. Powell*, 379 U.S. 48 (1964).

shown below, the only way Musk can plausibly argue irrelevance is to misrepresent the authorized scope of this investigation, which is plainly relevant to a legitimate purpose.

Once the SEC has established the three elements specified above, the burden shifts to Musk to show that the subpoena is "overbroad or unduly burdensome." *EEOC v. Children's Hosp. Medical Center*, 719 F.2d 1426, 1428 (9th Cir. 1983). *See also RNR Enters. v. SEC*, 122 F.3d 93, 97 (2d Cir. 1997) ("We defer to the agency's appraisal of relevancy, which must be accepted so long as it is not obviously wrong"); *SEC v. Brigadoon Scotch Distrib.*, 480 F.2d 1047, 1053 (2d Cir. 1973) ("[E]ven if the agency request is motivated by 'nothing more than official curiosity,' the subpoena is enforceable because agencies have a legitimate interest in seeing that the law and the public interest are maintained") (citing *United States v. Morton Salt Co.*, 338 U.S. 632 (1950)). Musk has made no such showing.

The SEC has subpoenaed Musk for testimony so that the SEC may ask him questions within the clear scope of its authority – questions that have not yet been asked. The SEC staff received substantial new information from Musk and third parties after July 2022, and it is seeking an additional session of testimony to cover that new information and other specific areas not previously covered. Application at 3-4. For this reason, additional testimony from Musk is "within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant," and the SEC's application should be granted. *Morton Salt Co.*, 338 U.S. at 652.

### A. Musk misrepresents the scope of the SEC's investigation in an effort to obscure the relevance of additional testimony

Musk repeatedly claims that the SEC staff "seeks irrelevant and immaterial information" and thus that the SEC is engaging in harassment. Opposition at 8, 14. Musk's relevance arguments rely almost entirely on the premise that the SEC's investigation relates to "nothing more than allegedly days-late filings." *Id.* at 1. Musk repeats this premise throughout his Opposition. *Id.* at 7-8 ("The SEC has spent the past eighteen months devoting its formidable resources to investigating Mr. Musk over an allegedly untimely filing."); *id.* at 10-12 (references to this investigation being about "an allegedly late Schedule 13 filing," "an

allegedly late filing" and "an allegedly days-late SEC filing"). ***This premise is false, and the SEC staff has repeatedly informed Musk that it is false.***

The SEC's investigation is not in fact limited to examining a potentially delinquent filing. From April 2022 to July 2022, Musk filed eleven Schedule 13 filings related to his purchases of Twitter stock or the Twitter acquisition. Second Andrews Decl. at ¶ 4. Not only does the Formal Order authorize the staff to investigate potential violations of the Section 13 of the Securities Exchange Act of 1934 ("Exchange Act") in connection with such filings – as well as any potential failure to timely make such filings – the Formal Order also authorizes the staff to investigate potential violations of Exchange Act Section 10(b) and Rule 10b-5, which prohibit fraud in connection with securities transactions, including in relation to Musk's public statements about the Twitter transaction. Dkt. No. 25-5.

Musk is well aware that the SEC's investigation involves more than a potentially untimely filing. Musk received a copy of the Formal Order in May 2022, and since then the SEC staff has repeatedly and consistently explained to Musk's counsel, including on July 12, 2022, July 27, 2022, September 5, 2023, and September 14, 2023, that the scope of this investigation also includes potential violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder related to, among other things, Musk's public statements. Second Andrews Decl. at ¶¶ 6-9, 12; Dkt. No. 2-5.

Notably, during Musk's July 12, 2022 testimony, Musk's counsel asserted that the April 17, 2022 Formal Order of Investigation did not authorize the SEC staff to examine: (1) any events taking place after April 5, 2022 (with the exception of an April 11, 2022 Schedule 13, which Musk's counsel did not object to); or (2) Musk's acquisition of Twitter, including the April 25, 2022 acquisition agreement or subsequent SEC filings related to that agreement. Second Andrews Decl. at ¶ 5. The staff's verbal and written responses to Musk's counsel clearly explained why Musk's objections were without merit, as well as the full scope of the SEC's investigation – including "other Schedule 13Ds and Gs being filed" and "other statements being made." *Id.* at ¶ 6-7. After the SEC issued a Corrected Formal Order – which merely removed the phrase "to April 5, 2022" from Section II – Musk's counsel withdrew his

objections. *Id.* at ¶ 8. During Musk's second testimony session on July 27, 2022, his counsel heard (but did not object to) the SEC staff's questions about Musk's May 2022 public tweets relating to the Twitter transaction, including questions about the accuracy of those tweets. *Id.* at ¶ 9.

Musk cannot now credibly claim that this investigation involves "nothing more than allegedly days-late filings." In light of the ***actual*** scope of this investigation, of which he has repeatedly been advised, the vast majority of Musk's objections as to relevance, overbreadth, and harassment immediately fail. For example, Musk complains that the SEC's requests for Musk's communications with investors in the Twitter acquisition after April 2022 "bear[] little to no connection with the [April 2022] filings." Opposition at 10. But communications with investors are undeniably relevant to the SEC's examination of the accuracy and timeliness of Musk's Schedule 13 filings in May, June, and July, as well as potential Exchange Act Section 10(b) violations in connection with statements Musk made to investors or to the public.

**B. The existence of other SEC investigations of a Musk-related company is not evidence of harassment or bad faith**

Musk cites – as purported evidence of harassment – the existence of four separate SEC investigations over a five-year period (including this investigation) and a contempt proceeding. Three of those investigations relate to the same publicly traded company, and the fourth (this investigation) relates to Musk's SEC filings and statements regarding another publicly traded company.[2] *Id.* at 9-10. Musk offers no basis to conclude that any of those other nonpublic,

[2] Although Musk refers to "a new investigation into SpaceX" in November 2019 (Opposition at 3, 9) that investigation involved potential violations by another company, which was publicly-traded. Second Andrews Decl. at ¶ 3. Musk also cites – as purported evidence of "vindication" of the SEC's 2018 settled action against him – to a favorable jury verdict in a class action lawsuit alleging violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder in connection with his 2018 "funding secured" tweet. Opposition at 3, 9. But private actions under Exchange Act Section 10(b) require proof of elements not present in SEC actions under that same statute (reliance, economic loss, and loss causation) and thus the trial outcome in the private action is not relevant to Musk's settlement with the SEC, and certainly is not relevant to the legitimacy of its other investigative matters. *See, e.g.*, *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (elements of private 10(b) actions); *SEC v. Rana Research*, 8 F.3d 1358, 1364 (9th Cir. 1993) (elements of SEC 10(b) actions).

confidential investigations was conducted without a legitimate basis, or that their existence can be attributed only to harassment. Musk also makes a vague, unsupported accusation of a "leak" to the media related to Musk's motion to quash the SEC's subpoena in a different matter, which is irrelevant to this investigation.[3] *Id.* at 3, 10.

It is not surprising that Musk – or a publicly-traded company for which he serves as executive – might at times be investigated by regulatory agencies. *See Brigadoon Scotch*, 480 F.2d at 1056 ("Every person doing business and every investor knows that government agencies conduct investigations for a variety of reasons, and most of them feel the duty to respond to a proper inquiry. As for those whose practices are investigated, it is a necessary hazard of doing business to be the subject of inquiry by a government regulatory agency.").[4] This record reflects routine investigations, not harassment.

### C. Musk's objection related to the September 2023 biography both undermines his other arguments and is now entirely moot

Musk separately attempts to justify his failure to appear for testimony on September 15, 2023 by pointing to the release of his authorized biography three days earlier. Although he was himself the source of much of the information contained in the book (Second Andrews Decl. at ¶ 11), Musk claims he needed more time to review the "newly released evidence" it contains. Opposition at 14 n. 3 ("It is perfectly reasonable to reschedule testimony to allow a party to adequately prepare in light of ***new evidence***.") (emphasis added). But Musk did not ask to ***reschedule*** his testimony; he ***canceled*** it and refused to appear without court intervention. And

---

[3] The only support Musk offers for this claim is: (1) Mr. Spiro's declaration, in which he claims to have personal knowledge of this leak (but does not provide any details how he would have personal knowledge of this); and (2) an equally vague and unsupported footnote in Musk's motion in another matter, which was denied by the District Court with the denial upheld by the Second Circuit. Opposition at 3, *SEC v. Musk*, Case No. 22-1291, 2023 WL 3451402, at *2 (2d Cir. May 15, 2023).

[4] The SEC is not unique in examining whether Musk's Twitter-related conduct in 2022 violated the federal securities laws. Musk is a defendant in two private actions that allege that a number of his Twitter-related public statements violated Exchange Act Section 10(b) and Rule 10b-5. *Pampena v. Musk*, Civ No. 22-cv-05937-CRB (N.D. Cal. 2022), Dkt No. 31; *Okla. Firefighters Pension and Ret. Sys. v. Musk*, Civ No. 22-cv-03026 (ALC) (S.D.N.Y. 2022), Dkt No. 33.

by acknowledging that "new evidence" exists, Musk has conceded the broader point that the SEC has a legitimate basis to seek further testimony from him.

In purported support of this objection, Musk cites questions the SEC recently asked his wealth manager during investigative testimony regarding one page from Musk's biography. Opposition at 14 n. 3, Second Andrews Decl. at ¶ 13. During this testimony, the SEC staff asked Musk's wealth manager about an April 2022 communication he had with Musk related to Musk's acquisition of Twitter – a communication that was directly quoted in the biography but never produced to the SEC. *Id.* Musk's wealth manager was unable to recall that communication, making Musk's testimony on this issue even more necessary and relevant. *Id.* In any event, Musk and his counsel have now had over two months to read the biography in search of material relevant to this investigation, so this objection is entirely moot.

**D. The duration of this investigation is in part a result of the SEC staff's patience and reasonableness with Musk**

Musk criticizes this investigation (which he variously characterizes as "rag[ing] on" or "meander[ing] on") for not having finished within eighteen months. Opposition at 4, 10. Again, Musk points to this as supposed evidence of harassment. *Id.* But the SEC staff's accommodation of Musk's busy schedule as the defendant in various court cases was a significant factor in the scheduling of Musk's testimony in September 2023 and not earlier. In August through early October 2022, Musk and his counsel were occupied with an expedited discovery schedule in litigation, which settled shortly before trial in October 2022. Second Andrews Decl. at ¶ 10. In January and into early February 2023, Musk and his counsel were occupied with a jury trial in a class action lawsuit in this district. *Id.* Instead of insisting on a testimony date in or around these matters, the SEC staff was patient and respected Musk's (and his counsel's) busy schedule. *Id.*

When the SEC staff approached Musk's counsel in April 2023 to schedule his testimony in San Francisco, Musk's counsel advised that he had obligations in June, July, and early August and therefore could not travel to San Francisco for his client's testimony until at least mid-August. Application at 4. Further, if Musk had made his objections known after that April 2023

conversation – or shortly after he was served with the subpoena in May 2023 – the SEC would have filed this Application months earlier. None of these delays was the SEC's doing.

**E. The timing and nature of Musk's objections suggest gamesmanship**

Musk makes an unequivocal claim in defense of his decision to object for the first time two days before his testimony: "The Commission misstates the facts to make it appear that Mr. Musk agreed to sit for a third testimony. No such thing occurred." Opposition at 12. The undisputed chronology undermines this claim and demonstrates Musk's dilatory intent:

- In June and July 2022, the SEC staff twice negotiated a date, time, and location for Musk's testimony, and served testimony subpoenas on Musk's counsel. Application at 3. Musk appeared for testimony both times. *Id.*
- In May 2023, the SEC staff negotiated a date, time, and location for a third session of Musk's testimony on September 14, 2023 in San Francisco and served a testimony subpoena on Musk's counsel. *Id.* at 4.
- On August 28, 2023, Musk's counsel requested that Musk' testimony be delayed by one day. On that day, the SEC agreed, and Musk's counsel accepted service of a revised third testimony subpoena – for September 15, 2023, still in San Francisco. *Id.*
- From May 23, 2023 until September 13, 2023, Musk did not object to the date, time, location, or fact of his appearance for testimony. *Id.* at 4-5.

Musk now argues that, despite this straightforward chronology, the SEC staff should never have assumed that Musk would actually ***comply with*** the third testimony subpoena.

For nearly four months after the parties negotiated the date and location of the September 2023 testimony, the SEC staff proceeded under the reasonable belief that Musk was acting in good faith and that he would therefore appear for that testimony, as he had the last two times, and as his counsel gave every indication he would. Musk must have known that the SEC staff would, absent notice that he intended to defy his testimony subpoena, proceed under the belief that he would appear. Tellingly, Musk does not offer ***any*** explanation as to why he did not object until two days before his testimony. Naturally, if Musk had objected to his testimony back in April or May, the SEC would have filed this Application four months earlier.

## III. THE SEC'S SUBPOENA COMPLIES WITH THE U.S. CONSTITUTION

Musk incorrectly argues that the May 2023 testimony subpoena is "invalid and cannot be enforced" because SEC enforcement staff, including the attorney who signed the subpoena, are constitutional Officers not properly appointed in accordance with the Appointments Clause, U.S. Const. Art. II, § 2, Cl. 2. Opposition at 16. The Exchange Act authorizes the Commission to investigate potential securities law violations and provides that "any member of the Commission or any officer designated by it" may "administer oaths and affirmations, subp[o]ena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records which the Commission deems relevant or material to the inquiry." 15 U.S.C. § 78u(b). The Commission has delegated authority to "order the making of" such investigations to the Director of the Division of Enforcement. 17 C.F.R. § 200.30-4(a)(13); *see also* 15 U.S.C. § 78d-1, 78d-2. The Director was appointed by, and serves at the pleasure of, the Commission in its capacity as head of a department, *see Free Enter. Fund v. PCAOB*, 561 U.S. 477, 510-13 (2010). In the Formal Order in this case, the Director of Enforcement authorized certain staff members to carry out the investigation, and one of those staff members issued the subpoenas underlying this action.

Musk claims that all SEC enforcement staff designated in formal orders—which would include the vast majority of the more than 1,300 Division of Enforcement employees—are constitutional Officers who must be appointed by the Commission (or the President, with advice and consent of the Senate). That argument flies in the face of the Supreme Court's repeated recognition that the vast majority of federal employees are just that—employees, not constitutional Officers. *See Free Enter. Fund*, 561 U.S. at 506 n.9 (estimating that the percentage of federal employees and agents who are not officers "dramatically" exceeds 90%); *United States v. Germaine*, 99 U.S. 508, 509 (1879) ("nine-tenths of the persons rendering service to the government undoubtedly" are not constitutional officers). The Court reiterated this point in *Lucia v. SEC*, 138 S. Ct. 2044 (2018), noting that "non-officer employees" constitute "the broad swath of" the "Government's workforce" and "the Appointments Clause cares not a whit about who

named them." *Id.* at 2051.[5] That is because the Appointments Clause only governs the appointment of "'Officers of the United States,' a class of government officials distinct from mere employees." *Id.* at 2049 (quoting U.S. Const. Art. II, § 2, Cl. 2). Principal officers—a category that includes "ambassadors, ministers, heads of departments, and judges," *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 884 (1991)—must be appointed by the President, by and with the advice and consent of the Senate. U.S. Const. Art. II, § 2, Cls. 1, 2. "[I]nferior Officers"—those "whose work is directed and supervised at some level by" principal officers, *Edmond v. United States*, 520 U.S. 651, 663 (1997)—may either be appointed by the President, with the advice and consent of the Senate, or, if Congress has so provided, may be appointed by "the President alone," the "Courts of Law," or the "Head[s] of [a] Department." U.S. Const. Art. II, § 2, Cl. 2.

The staff attorney who signed the testimony subpoena is one of the many "non-officer employees" whose method of hiring is not subject to the Appointments Clause. The staff attorney who issued the testimony subpoena lacks the "extensive powers . . . comparable to [those] of a federal district judge conducting a bench trial," *Lucia*, 138 S. Ct. at 2049 (internal quotation omitted), that informed the Supreme Court's conclusions that administrative law judges and special trial judges of the United States Tax Court are constitutional officers. *Lucia*, 138 S. Ct. at 2053-55 (administrative law judges); *Freytag v. Comm'r*, 501 U.S. 868, 881-82 (1991) (special trial judges). Unlike ALJs, SEC staff cannot—by way of example only—"conduct trials," "rule on the admissibility of evidence," or "issue decisions containing factual findings, legal conclusions, and appropriate remedies." *Lucia*, 138 S. Ct. at 2053 (internal quotations omitted). While SEC staff can issue subpoenas, "administer oaths and affirmations", "take evidence," and "require the production of . . . records," Opposition at 17-18, they can do so only if so authorized in a formal order directing a particular investigation, and then only for purposes of that investigation under the supervision of the Director of Enforcement. Moreover,

[5] *See also* Office of Management and Budget, Analytical Perspectives, Budget of the U.S. Government, Fiscal Year 2022, p. 44, Table 5-2 (2021) (estimating that there are more than 4.3 million federal employees, including more than 2.8 million executive branch civilian employees).

as this case demonstrates, SEC staff cannot compel compliance with subpoenas, including those that "require production of documents . . . [or] testimony under oath." Opposition at 18. Only a court—in this case, this Court—can compel compliance with an SEC subpoena. 15 U.S.C. § 78u(c); *see also* SEC Division of Enforcement, Enforcement Manual § 3.2.8 (SEC subpoenas are "not self-enforcing. Absent a court order, we cannot compel a witness or custodian to comply with any subpoena."). The fact that SEC staff cannot compel compliance with subpoenas is another reason SEC staff are unlike, and lack the significant authority of, the ALJs to whom Musk attempts to equate them. *See Lucia*, 138 S. Ct. at 2053 (finding that ALJs, like Tax Court special trial judges, have "'the power to enforce compliance with discovery orders'") (quoting *Freytag*, 501 U.S. at 882).

As such, SEC staff perform functions that "are essentially of an investigative and informative nature," and "there can be no question" that non-constitutional-officer employees "may exercise them." *Buckley v. Valeo*, 424 U.S. 1, 137 (1976) (per curiam) (holding, with respect to the Federal Election Commission whose members were not appointed in accordance with the Appointments Clause, "[i]nsofar as the powers confided in the Commission are essentially of an investigative and informative nature . . . there can be no question that the Commission as presently constituted may exercise them") (collecting authority). Thus, under the Supreme Court's "basic framework for distinguishing between officers and employees," *Lucia*, 138 S. Ct. at 2051, SEC staff attorneys, who perform investigative functions pursuant to formal orders, are not officers. *Id.* (quoting *Buckley* for proposition that constitutional Officers "'exercise significant authority pursuant to the laws of the United States'").

Musk also argues that the use of the term "officer" by the Exchange Act and Enforcement staff supports his position. Musk, again, is mistaken. The Exchange Act does not use the phrase "Officer of the United States" to describe individuals who may issue subpoenas. But, even if it did, that usage would not be dispositive. In *Steele v. United States*, for example, the Supreme Court held that "the expression civil officer of the United States duly authorized to enforce or assist in enforcing any law thereof, as used in the Espionage Act, does not mean an officer in the constitutional sense." 267 U.S. 505, 507 (1925) (internal quotation omitted); *see*

*also id.* (recognizing that while the phrase "officer of the United States" in federal statutes "usually" refers to constitutional Officers, it can, depending on context, also refer to nonconstitutional officers). Just as Congress's use of the same language as the Appointments Clause—Officers of the United States—is not dispositive as to constitutional Officer status, its use of the naked term "officer" is also not dispositive. *See, e.g.*, *Lamar v. United States*, 240 U.S. 60, 65 (1916) (referring to the word "officer" in the criminal code, and noting "words may be used in a statute in a different sense from that in which they are used in the Constitution"); *United States v. Hendee*, 124 U.S. 309, 313 (1888) (clerk was "officer" under compensation statute, even though he was "not, in the constitutional sense of the word, an officer of the United States").

Indeed, if Musk were correct that the use of the term "officer" in a statute necessarily meant a constitutional Officer within the meaning of the Appointments Clause, there would have been no need for the Supreme Court to issue its 13-page opinion in *Lucia*. The Court could simply have adopted the petitioners' argument that the federal securities laws and the Administrative Procedure Act, as enacted in 1946, both referred to ALJs as "officers." *See* Brief for Petitioners, *Lucia v. SEC*, No. 17-130, 2018 WL 993876, at *35-36 (S. Ct. filed Feb. 21, 2018) (arguing same). But the Supreme Court did not do so; the Court never even referred to Congress's use of the term "officer" in any statute as indicative of ALJs' status as constitutional Officers. Instead, it relied on the "basic framework for distinguishing between officers and employees." *Lucia*, 138 S. Ct. at 2051. And, under that framework, SEC staff are not constitutional Officers—they are employees.

Finally, Musk argues that the testimony subpoena is improper because the SEC staff who issued the subpoena is separated by more than one layer of "good-cause" protection from removal directly by the President. Opposition at 19-20. This argument is predicated on the SEC staff being constitutional Officers within the meaning of the Appointments Clause. Because SEC staff are not constitutional Officers, this argument likewise fails.

In any event, Musk's argument on this score would fail even if SEC staff were constitutional Officers. As the Supreme Court has cautioned, the functional "analysis contained

in our removal cases is designed not to define rigid categories of those officials who may or may not be removed at will by the President." *Morrison v. Olson*, 487 U.S. 654, 689 (1988). And, contrary to Musk's representation, the Supreme Court did not hold that "no inferior officers may be separated by more than one layer of 'good-cause' protection from removal by the President." Resp. at 13-14 (citing *Free Enter. Fund*). The decision in *Free Enter. Fund* was limited to the members of the Public Company Accounting Oversight Board, 561 U.S. at 492; the Court had "no reason" to address whether other positions "not at issue in this case[] are so structured as to infringe the President's constitutional authority," *id.* at 507-08; *see also id.* at 506 (noting that "the very size and variety of the Federal Government . . . discourage general pronouncements on matters neither briefed nor argued here"). Unlike the Board members in *Free Enter. Fund*, SEC staff do not wield "significant executive power," *id.* at 514; they do not "determine the policy and enforce the laws of the United States," *id.* at 484. SEC enforcement staff are subordinate to, and can act only as directed by, the Director of Enforcement, who is appointed by and serves at the pleasure of the Commission. Civil-service protections afforded to SEC staff do not "subvert[] the President's ability to ensure that the laws are faithfully executed." *Free Enter. Fund*, 561 U.S. at 498; *see also id.* at 507 ("Nothing in our opinion . . . should be read to cast doubt on the use of what is colloquially known as the civil service system within independent agencies.").

Moreover, the Supreme Court's decision in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), which addressed the removability of the head of the Federal Housing Finance Agency, dooms any removability claim here. *Collins* held that unconstitutional removal restrictions do not "strip [an officer] of the power to undertake the other responsibilities of his office." *Id.* at 1788 n.23. Whatever "the President's authority to remove the confirmed" officer, the Court reasoned, absent a "constitutional defect in the statutorily prescribed method of appointment to that office," "there is no reason to regard any of the actions taken by the [agency] ... as void." *Id.* at 1787. *See also CFPB v. CashCall, Inc.*, 35 F.4th 734, 742-43 (9th Cir. 2022) (holding that an enforcement action was validly brought "despite the unconstitutional limitation" on the Director's removal because the "party challenging an agency's past actions" failed to "show how the unconstitutional removal provision *actually harmed* the party"). Musk does not claim that the

President wished to remove an SEC employee, much less "show[n] a connection between the President's frustrated desire to remove the actor and the agency action complained of." *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 632 (5th Cir. 2022), *cert. granted on other grounds*, 143 S. Ct. 978 (2023) (citing *Collins*, 141 S. Ct. at 1789). *See CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 181 (2d Cir. 2023) (rejecting removability challenge involving civil investigative demand under *Collins*).

## IV. THERE IS NO BASIS TO STAY THIS APPLICATION

For the foregoing reasons, the Court should reject Musk's request for a stay pending the outcome of the Supreme Court's decision in *Jarkesy* (Sup. Ct. No. 22-859, oral argument scheduled for November 29). Musk has made no argument that any removability problem here has prejudiced him under *Collins*. As a result, *Jarkesy* is unlikely to have any bearing on the outcome of Musk's challenge to the pending subpoena.

## V. CONCLUSION

For the reasons set forth above and in the SEC's Application, the Commission respectfully requests that the Court issue an order compelling Elon Musk to comply with the Commission's administrative subpoena requiring his testimony.

Dated: November 16, 2023

Respectfully submitted,

*_/s/ Robin Andrews_*
ROBIN ANDREWS
Attorney for Applicant
SECURITIES AND EXCHANGE COMMISSION