1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Alex Spiro (*pro hac vice*)
2   51 Madison Ave, 22nd Floor
    New York, NY 10010
3   Telephone: (212) 849-7000
    Facsimile: (212) 849-7100
4   alexspiro@quinnemanuel.com

5
    Christopher G. Michel (*pro hac vice*)
6   Rachel G. Frank (California Bar No. 330040)
    1300 I Street NW, Suite 900
7   Washington, D.C. 20005
    Telephone: (202) 538-8000
8   Facsimile: (202) 538-8100
    christophermichel@quinnemanuel.com
9   rachelfrank@quinnemanuel.com

10
    *Attorneys for Respondent Elon Musk*
11
                    UNITED STATES DISTRICT COURT
12
                  NORTHERN DISTRICT OF CALIFORNIA
13
                     SAN FRANCISCO DIVISION
14

15  SECURITIES AND EXCHANGE            Case No. 3:23-mc-80253-JSC
16  COMMISSION,
                                       **NOTICE OF MOTION AND MOTION FOR**
17                  Applicant,         **DE NOVO DETERMINATION OF**
                                       **DISPOSITIVE MATTER REFERRED TO**
18       v.                            **MAGISTRATE JUDGE**

19  ELON MUSK,
20                  Respondent.        Date:    May 9, 2024
                                       Time:    10:00 a.m.
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ............................................................................... 1

STATEMENT OF ISSUES................................................................................................... 1

INTRODUCTION................................................................................................................. 1

BACKGROUND.................................................................................................................... 3

LEGAL STANDARD............................................................................................................ 8

ARGUMENT ......................................................................................................................... 8

I.    THE SUBPOENA SEEKING A THIRD ROUND OF TESTIMONY FROM MR.
      MUSK IS OVERBROAD AND UNREASONABLE ............................................... 9

      A.    The Subpoena Lacks A Valid Justification ................................................ 9

      B.    The R&R Provides No Valid Ground For Enforcement ........................ 12

II.   ENFORCEMENT OF THE SUBPOENA WOULD VIOLATE THE CONSTITUTION . 14

      A.    Enforcement Of The Subpoena Would Violate The Appointments Clause ........... 14

            1.    The Appointments Clause Does Not Permit Issuance Of The Subpoena
                  By An SEC Enforcement Staff Member ................................... 14

            2.    The R&R And The SEC Fail To Refute The Appointments Clause Flaw .. 17

      B.    Enforcement Division Staff Are Unconstitutionally Shielded From Removal ....... 20

            1.    Staff Are Subject To Two Layers Of For-Cause Protection ...................... 21

            2.    The SEC Has No Answer For The Removal Restrictions ......................... 22

III.  ADOPTING THE R&R WOULD BE PREMATURE IN LIGHT OF *JARKESY*............. 23

CONCLUSION ..................................................................................................................... 24

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

## Cases

4

*Amini v. AUS Mktg. Rsch. Sys., Inc.*,
    No. SA-CV-15-1270(AG)(JCGx), 2016 WL 7647690 (C.D. Cal. Feb. 26, 2016) ................ 24

5

*In re Application for Ord. Quashing Deposition Subpoenas, dated July 16, 2002*,
    No. M8-85, 2002 WL 1870084 (S.D.N.Y. Aug. 14, 2002) .................................................. 13

6

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ..................................................................................... 15, 18, 19

7

*CMAX, Inc. v. Hall*,
    300 F.2d 265 (9th Cir. 1962) ............................................................................... 24

8

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021) ....................................................................................... 22

9

10

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
    592 F. Supp. 3d 568 (E.D. Tex. 2022) ................................................................... 22

11

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
    91 F.4th 342 (5th Cir. 2024) ............................................................................... 21

12

*Doe v. SEC*,
    No. C11–80209-CRB, 2011 WL 5600513 (N.D. Cal. Nov. 17, 2011) ................................... 8

13

*Edmond v. United States*,
    520 U.S. 651 (1997) .......................................................................................... 14

14

15

*EEOC v. Children's Hosp. Med. Ctr. of N. Cal.*,
    719 F.2d 1426 (9th Cir. 1983) ................................................................................ 9

16

*Ex parte Hennen*,
    38 U.S. (13 Pet.) 230 (1839) ............................................................................... 16

17

*FDIC v. Garner*,
    126 F.3d 1138 (9th Cir. 1997) ................................................................................ 8

18

*Fed. Hous. Fin. Agency v. SFR Invs. Pool 1, LLC*,
    No. 2:17-CV-00914-GMN-PAL, 2018 WL 1524440 (D. Nev. Mar. 27, 2018) ................. 9, 13

19

20

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*,
    140 S. Ct. 1649 (2020) ....................................................................................... 16

21

*Flatt v. SEC*,
    No. 10-60073-MC, 2010 WL 1524328 (S.D. Fla. Apr. 14, 2010) ...................................... 12

22

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ..................................................................... 2, 15, 19, 20, 21, 22

23

*Freytag v. Comm'r of Internal Revenue*,
    501 U.S. 868 (1991) ...................................................................................... 14, 18

24

25

*Gewerter v. SEC*,
    No. CV-16-02556-PHX-DLR, 2016 WL 4074117 (D. Ariz. Aug. 1, 2016) ......................... 12

26

*In re Grand Jury Investigation*,
    315 F. Supp. 3d 602 (D.D.C. 2018) ...................................................................... 16

27

28

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935) .......................................................................................... 21

*INS v. Chadha*,
  462 U.S. 919 (1983) .......................................................................................... 20

*Jarkesy v. SEC*,
  34 F.4th 446 (5th Cir. 2022) ...................................................................... 2, 22, 23

*Leyva v. Certified Grocers of California, Ltd.*,
  593 F.2d 857 (9th Cir. 1979) ............................................................................ 23

*Lucia v. SEC*,
  138 S. Ct. 2044 (2018) ............................................ 2, 14, 15, 16, 17, 18, 19, 20

*McGrain v. Daugherty*,
  273 U.S. 135 (1927) .......................................................................................... 19

*Mediterranean Enters. Inc. v. Ssangyong Corp.*,
  708 F.2d 1458 (9th Cir. 1983) .......................................................................... 23

*Morrison v. Olson*,
  487 U.S. 654 (1988) .......................................................................................... 16

*Musk v. SEC*,
  S. Ct. No. 23-626 (Dec. 21, 2023) ...................................................................... 3

*Myers v. United States*,
  272 U.S. 52 (1926) ..................................................................................... 16, 20

*Nelson v. SEC*,
  No. C08-80080-MISC-(JF)(HRL), 2008 WL 2444794 (N.D. Cal. June 16,
  2008) ................................................................................................................ 11

*Oklahoma Press Pub. Co. v. Walling*,
  327 U.S. 186 (1946) .......................................................................................... 10

*Peters v. United States*,
  853 F.2d 692 (9th Cir. 1988) ...................................................................... 2, 10, 11

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
  881 F.3d 75 (D.C. Cir. 2018) ............................................................................ 21

*Prudential Ins. Co. of Am. v. Lai*,
  42 F.3d 1299 (9th Cir. 1994) .............................................................................. 9

*Resol. Tr. Corp. v. Walde*,
  18 F.3d 943 (D.C. Cir. 1994) ............................................................................ 11

*RNR Enters., Inc. v. SEC*,
  122 F.3d 93 (2d Cir. 1997) ................................................................................ 11

*Rondeau v. Mosinee Paper Corp.*,
  422 U.S. 49 (1975) .............................................................................................. 4

*Rosiere v. SEC*,
  No. 2:09-CV-01975(JCM)(PAL), 2010 WL 489526 (D. Nev. Feb. 5, 2010) ...... 12

*SEC v. Ambassador Cap. Mgmt., LLC*,
  No. CV 18-MC-51442, 2019 WL 1785353 (E.D. Mich. Apr. 24, 2019) .............. 17

*SEC v. Blackfoot Bituminous, Inc.*,
  622 F.2d 512 (10th Cir. 1980) .......................................................................... 12

*SEC v. Brigadoon Scotch Distrib.*,
  480 F.2d 1047 (2d Cir. 1973) ...................................................................... 2, 11

*SEC v. Jerry T. O'Brien, Inc.*,
  467 U.S. 735 (1984) ................................................................................................ 8, 13

*SEC v. Musk*,
  1:18-cv-8865, (S.D.N.Y. Apr. 27, 2022) ................................................................ 3, 4

*SEC v. Musk*,
  No. 22-1291, 2023 WL 3451402 (2d Cir. May 15, 2023) .......................................... 3

*SEC v. Obioha*,
  No. 12-cv-80109-WHA, 2012 WL 4889286 (N.D. Cal. Oct. 12, 2012) ...................... 8

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
  140 S. Ct. 2183 (2020) ....................................................................... 16, 20, 21, 23

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .............................................................................................. 24

*In re Tesla Inc. Sec. Litig.*,
  No. 18-CV-04865-EMC, Dkt. No. 671 (N.D. Cal. Feb. 3, 2023) ................................ 3

*Trump v. Mazars USA, LLP*,
  140 S. Ct. 2019 .................................................................................................... 19

*Twitter, Inc. v. Musk*,
  No. 2022-0613-KSJM, Dkt. No. 1 (Del. Ch. July 12, 2022) ...................................... 9

*United States v. Allred*,
  155 U.S. 591 (1895) .............................................................................................. 16

*United States v. Arthrex, Inc.*,
  141 S. Ct. 1970 (2021) .......................................................................................... 14

*United States v. Donziger*,
  38 F.4th 290 (2d Cir. 2022) .................................................................................. 16

*United States v. Fensterwald*,
  553 F.2d 231 (D.C. Cir. 1977) ............................................................................... 11

*United States v. Germaine*,
  99 U.S. 508 (1879) ................................................................................................ 20

*United States v. Hartwell*,
  73 U.S. (6 Wall.) 385 (1867) ................................................................................. 16

*United States v. Moore*,
  95 U.S. 760 (1877) ............................................................................................... 16

*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950) .............................................................................................. 11

*United States v. Perkins*,
  116 U.S. 483 (1886) .............................................................................................. 16

*United States v. Providence Journal Co.*,
  485 U.S. 693 (1988) .............................................................................................. 16

**Constitutional Provisions & Statutes**

U.S. Const. art. II, § 1, cl. 1 ......................................................................................... 20

U.S. Const. art. II, § 2, cl. 2 ....................................................................................... 2, 14

5 U.S.C. §§ 2301-2302 ................................................................................................ 21

5 U.S.C. § 4802 ..................................................................................................... 15, 21

15 U.S.C. § 78j ..................................................................................................... 5

15 U.S.C. § 78u(e)(1) ......................................................................................... 17

15 U.S.C. § 7217(d)(3) ...................................................................................... 21

28 U.S.C. § 542 .................................................................................................. 16

28 U.S.C. § 636(b)(1)(C) .................................................................................... 8

## **Rules & Regulations**

17 C.F.R. § 200.10 ............................................................................................. 15

17 C.F.R. § 200.30-4(a)(1) ................................................................................ 15

17 C.F.R. § 240.10b-5 ................................................................................ 3, 5, 10

17 C.F.R. § 240.13d-1 .......................................................................................... 4

N.D. Cal. Civ L. R. 72-3 ................................................................................. 1, 7

Fed. R. Civ. P. 72(b) ........................................................................................ 1, 8

Gen. Order No. 44(E)(1)(c) ................................................................................. 7

## **Other Authorities**

*Appointment & Removal of Fed. Rsrv. Bank Members of the Fed. Open Mkt. Comm.*, 43 Op. O.L.C. __ (Oct. 23, 2019) ................................................. 15

*Elon Musk Is Active Now*, Bloomberg (Apr. 6, 2022), https://bit.ly/3P21LMl ............ 3

*In the Matter of Joseph Theodore Lukens, Jr., Respondent.*, Release No. 98542, (Sept. 27, 2023), *available at* https://www.sec.gov/files/litigation/admin/2023/34-98542.pdf ............................. 5

*In the Matter of Lawrence I. Rosen, Respondent.*, Release No. 98545 (Sept. 27, 2023), *available at* https://www.sec.gov/files/litigation/admin/2023/34-98545.pdf..................................................................................................... 5

NTEU Chapter 293 Authorized Version, https://www.secunion.org/collective-bargaining-agreement-nteu-chapter-293-authorized-version ................................ 22

*Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73 (2007) ............................................................................. 15, 18

Securities Exchange Act Release No. 60448, 74 FR 40068 (Aug. 11, 2009) ............................ 17

Securities Exchange Act Release No. 62690, 75 FR 49820 (Aug. 16, 2010) ............................ 17

**NOTICE OF MOTION AND MOTION**

NOTICE IS HEREBY GIVEN that on May 9, 2024, at 10:00 a.m., at the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, Respondent Elon Musk will and hereby does move for de novo review of Magistrate Judge Laurel Beeler's February 16, 2024, Report & Recommendation ("R&R") recommending the grant of the Securities and Exchange Commission's Application for an Order Compelling Compliance with an Administrative Subpoena. Specifically, Mr. Musk moves for an Order denying the application.  Pursuant to Fed. R. Civ. P. 72(b)(2) and Civil L. R. 72-3(a), Mr. Musk objects to the R&R for the reasons set forth below.

**STATEMENT OF ISSUES**

1.      Whether the application should be denied because the administrative subpoena seeking a third session of testimony from Mr. Musk in this investigation lacks a legitimate purpose and imposes an unreasonable burdensome.

2.      Whether the application should be denied because the subpoena was invalidly issued by enforcement staff who were not properly appointed and are not properly removable.

**INTRODUCTION**

This subpoena is the latest in a litany of duplicative and harassing demands the Securities and Exchange Commission ("SEC" or "Commission") staff (the "Enforcement Staff" or "Staff") have made under the guise of never-ending investigations into Mr. Musk and companies in which he holds leadership roles or financial stakes.  Numerous previous investigations into Mr. Musk have not resulted in any finding of liability.  Indeed, the only issue to ever reach a jury resulted in near-immediate exoneration of Mr. Musk.  Yet the SEC Staff persists in attempting to tarnish Mr. Musk's record with baseless investigations.  In the application now before the Court, Commission Staff seek to require Mr. Musk to appear for testimony for the third time in a nearly two-years-long investigation prompted by nothing more than allegedly days-late filings.  The application should be denied for two principal reasons.

First, the subpoena lacks a legitimate investigative purpose and imposes an unreasonable burden because it seeks information that SEC Staff already have or could have sought in their prior two sessions with Mr. Musk.  "[W]hile the SEC is entitled to great freedom in conducting its

1    investigations, it is not at liberty to act unreasonably." *SEC v. Brigadoon Scotch Distrib.*, 480 F.2d

2    1047, 1056 (2d Cir. 1973).  Nor may it engage in a "fishing expedition."  *Peters v. United States*,

3    853 F.2d 692, 700 (9th Cir. 1988).   But that is what the SEC Staff seek here.  They have already

4    asked Mr. Musk eight hours' worth of questions over two separate sessions, and he has produced

5    hundreds of documents.  Although the Staff claim to have further questions for Mr. Musk, they have

6    not identified any relevant or material information that they lack.  At some point, the questions must

7    end and the Commission must decide.  That point has come.

8         Second, the issuance of the subpoena by SEC Staff—not the Commission—exceeds core

9    constitutional restraints.  Issuance of an administrative subpoena compelling testimony in support

10   of an enforcement investigation is an exercise of significant governmental authority that can be

11   performed only by "Officers of the United States."  U.S. Const. art. II, § 2, cl. 2.  And such officers

12   can be appointed only by the President, a court, or the head of a department.  *Id.*; *see Lucia v. SEC*,

13   138 S. Ct. 2044, 2051 (2018).  But the subpoena to Mr. Musk was not issued by anyone appointed

14   in compliance with those requirements.  It was issued by an SEC Staff member who was appointed

15   by the SEC Director of Enforcement.  The subpoena is therefore unlawful under the Appointments

16   Clause, and the application should be denied on that basis.

17        The application should also be denied because the SEC Staff member who issued the

18   subpoena is impermissibly insulated from presidential supervision by at least two layers of statutory

19   removal protection.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492

20   (2010).  Indeed, another federal court recently struck comparable statutory removal protections for

21   SEC Administrative Law Judges (ALJs) in a decision now on review before the Supreme Court.

22   *Jarkesy v. SEC*, 34 F.4th 446, 463 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023).

23        The R&R fails to seriously grapple with those arguments and effectively rubber stamps the

24   SEC's request to conduct an unlimited and unaccountable investigation.  On de novo review, this

25   Court should reject the R&R and issue an order denying the application.  In the alternative, the Court

26   should stay these proceedings pending the Supreme Court's forthcoming decision in *Jarkesy*.

27

28

## BACKGROUND

For five years and counting, the SEC has subjected Mr. Musk to unrelenting scrutiny, prompting commentators to observe that there appears to be an "Elon Musk Division" at the Commission.[1]  The SEC Staff's long-running investigation is another chapter in that troubling story.

***Tesla "Funding Secured" Investigation and Litigation.***  In September 2018, the SEC brought actions for securities fraud against Mr. Musk and Tesla regarding statements Mr. Musk made on his Twitter account about a potential (ultimately hypothetical) transaction to take the company private.  *SEC v. Musk*, 1:18-cv-8865 (S.D.N.Y.), Dkt. No. 1; *SEC v. Tesla*, 1:18-cv-8947 (S.D.N.Y.), Dkt. No. 1.  To resolve the charges, the SEC effectively forced Mr. Musk to sign a consent decree that curtailed his freedom to communicate with the public by requiring a securities lawyer to pre-approve his public communications on a range of subject matters—despite the obvious First Amendment implications of that restriction and a sheer lack of evidence that Mr. Musk had violated the securities laws.  *SEC v. Musk*, 1:18-cv-8865 (S.D.N.Y.), Dkt. Nos. 6, 46.  Mr. Musk has repeatedly sought relief from this unconstitutional judgment and continues to assert his right to speak freely—including through a certiorari petition that the Supreme Court recently ordered the SEC to answer.  *See id.*, Dkt. No. 70; *SEC v. Musk*, No. 22-1291, 2023 WL 3451402 (2d Cir. May 15, 2023); *Musk v. SEC*, S. Ct. No. 23-626 (Dec. 21, 2023).

The SEC, for its part, has been apparently unconcerned with infringing on core rights.  Just months after Mr. Musk entered into the consent decree, the SEC ran to court, seeking to have Mr. Musk held in contempt for a tweet he allegedly made without pre-approval.  The court denied the SEC's motion and admonished the SEC for its overreach.  *SEC v. Musk*, 1:18-cv-8865 (S.D.N.Y.), Dkt. Nos. 18, 39, 48.  Meanwhile, in February 2023, a jury in this District vindicated Mr. Musk in a private securities action by finding he had not broken the law in sending the tweet that was the subject of the SEC investigation and resulted in the consent decree.  *See In re Tesla Inc. Sec. Litig.*, No. 18-CV-04865-EMC, Dkt. No. 671 (N.D. Cal. Feb. 3, 2023) (jury verdict finding Mr. Musk not liable for Rule 10b-5 claims).  Yet the Commission's unconstitutional consent decree remains.

---

[1]  Matt Levine, *Elon Musk Is Active Now*, Bloomberg (Apr. 6, 2022), https://bit.ly/3P21LMl.

***Other Serial Investigations.***  Apparently unsatisfied with extracting a consent decree, the SEC has forged ahead, opening one investigation after another into Mr. Musk and companies connected to him.  Dkt. No. 25, Declaration of Alex Spiro ("Spiro Decl.") ¶¶ 11–14.  The Commission has issued dozens upon dozens of subpoenas over the years, imposing burdensome compliance costs on Mr. Musk and related entities without ever charging Mr. Musk with violating the law.  *Id.* ¶ 11.

The Commission has also resorted to dirty tactics.  In 2022, when Mr. Musk sought relief in the Southern District of New York from the Commission's harassment, at least one member of the SEC Staff responded by leaking to the press certain information regarding its investigation.  *See* Mot. n.4, *SEC v. Musk*, 1:18-cv-8865, Dkt. No. 71, (S.D.N.Y. Mar. 8, 2022).  The SEC has never denied it was responsible for the leak.  Spiro Decl. ¶ 13.

***This Long-Running Investigation.***  Nearly two years ago, in April 2022, the Commission launched an investigation into certain SEC filings Mr. Musk made in connection with his purchase of Twitter stock earlier that year.  Spiro Decl. ¶ 14.  Specifically, SEC Rule 13d-1 requires that certain disclosures be filed with the SEC when an individual acquires more than 5% of a publicly traded company's stock.  *See* 17 C.F.R. § 240.13d-1.  A Schedule 13G form must be filed within 10 days once more than 5% of a company's stock is acquired and may only be filed by a "passive" investor, i.e., a person who "[h]as not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer."  17 C.F.R. § 240.13d-1(c).  If the person is not a passive investor, a Schedule 13D must be filed instead.  *Id.*  The "purpose of the [Section 13(d) disclosures] is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party."  *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58 (1975).  "Congress intended to do no more than give incumbent management an opportunity to express and explain its position."  *Id.*

On April 4, 2022, Mr. Musk disclosed his acquisitions of Twitter stock with a Schedule 13G form.  Dkt. No. 25-1, Ex. 1, Apr. 4, 2022 Schedule 13G.  That same day, the SEC's Division of Corporation Finance sent Mr. Musk an inquiry about the filing.  Spiro Decl. ¶ 14.  The next day,

Motion for De Novo Determination of Dispositive Matter Referred to Magistrate Judge

1 Mr. Musk filed a Schedule 13D form.  Dkt. No. 25-2, Ex. 2, Apr. 5, 2022 Schedule 13D.  The SEC

2 routinely resolves similar untimely filings by imposing at most a modest fine.[2]  Here, however, the

3 Enforcement Division intervened so that the same Staff investigating Mr. Musk's compliance with

4 the 2018 consent decree could also run the present investigation.  *Id.*

5 On April 17, 2022, the SEC's Director of the Division of Enforcement Gurbir Grewal issued

6 an Order Directing Private Investigation and Designating Officers to Take Testimony (the "Formal

7 Order") regarding whether Mr. Musk properly filed the Schedules 13D and 13G, and whether he

8 may have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in connection with his

9 acquisitions of Twitter stock.  Dkt. No. 25-3, Ex. 3, Formal Order.  The Formal Order purportedly

10 empowered SEC counsel Robin Andrews and other Enforcement Staff to "administer oaths and

11 affirmations, subpoena witnesses, compel their attendance, take evidence, and require the

12 production of any books, papers, correspondence, memoranda, or other records deemed relevant or

13 material to the investigation."  Dkt. No. 2, Declaration of Robin Andrews ("Andrews Decl."), ¶ 5(i)–

14 (ii).

15 Vested with that authority, the SEC Staff has issued at least 32 administrative subpoenas,

16 Spiro Decl. ¶ 15, and counsel has produced hundreds of pages of documents, Andrews Decl. ¶ 7.

17 Mr. Musk alone has received five document subpoenas and three testimony subpoenas.  Spiro Decl.

18 ¶ 15.  The Staff's intrusive and overly broad discovery demands have sought, *inter alia*, all of

19 Mr. Musk's emails relating to the Twitter merger through August 2022 and the testimony of multiple

20 individuals who had no role in the Schedule 13 filings.  *Id.*

21 As part of its sprawling investigation, the Staff has also taken testimony from Mr. Musk and

22 at least three other individuals a combined seven times.  *Id.*  On July 12, 2022, the Staff took

23 Mr. Musk's testimony via WebEx for approximately four hours regarding, *inter alia*, Mr. Musk's

24

25 [2]  *See, e.g.*, *In the Matter of Lawrence I. Rosen, Respondent.*, Release No. 98545 (Sept. 27, 2023),
26 *available at* https://www.sec.gov/files/litigation/admin/2023/34-98545.pdf (imposing $150,000 fine on individual who failed to timely file various Schedule 13Gs up to a year late); *In the Matter*
27 *of Joseph Theodore Lukens, Jr., Respondent.*, Release No. 98542, (Sept. 27, 2023), *available at* https://www.sec.gov/files/litigation/admin/2023/34-98542.pdf (imposing $120,000 fine on
28 individual who failed to timely file various Schedule 13D amendments).

purchases of Twitter stock in 2022, discussions with Mr. Musk's wealth manager regarding SEC filing requirements, Mr. Musk's Schedule 13G filing and subsequent Schedule 13D amendment, and discussions about joining Twitter's board.  *Id.* ¶ 17.  After counsel objected to the attempt to question Mr. Musk about conduct beyond the scope of the Formal Order, Dkt. No. 25-4, Ex. 4, July 13, 2022 Letter, the Commission issued a corrected Formal Order (the "Corrected Formal Order") covering all conduct since March 24, 2022.  Dkt. No. 25-5, Ex. 5, Corrected Formal Order.

The Staff subsequently took Mr. Musk's testimony for a second remote, approximately four-hour session regarding, *inter alia*, another Schedule 13D Amendment and his acquisition of Twitter. Spiro Decl. ¶ 18.  The Staff also took testimony from Mr. Musk's wealth manager via WebEx regarding SEC filing requirements in connection with the purchase of Twitter shares, his role in preparing the Schedules 13G and 13D, and his reliance on advice from counsel.  *Id.* ¶ 16.  The Staff took testimony from Mr. Musk's wealth manager a second time for approximately four hours via WebEx regarding, *inter alia*, the Schedule 13 filings and Mr. Musk's acquisition of Twitter.  *Id.* ¶ 19.  And, finally, the Staff took testimony from Mr. Musk's wealth manager remotely a third time for approximately four hours.  *Id.* ¶ 21.

***The Pending Application.***  Despite having already taken the testimony of Mr. Musk, his wealth manager, and others, on May 23, 2023, the Staff served a third testimony subpoena on Mr. Musk compelling him to testify in person on September 14, 2023 at the SEC's San Francisco Regional Office.  Dkt. No. 2-2, SEC Ex. 2, May 23, 2023 Subpoena.  Counsel agreed to accept service of the subpoena via email, but did not consent or concede that the Staff had the authority to compel Mr. Musk's attendance.  Spiro Decl. ¶ 20.  The testimony was subsequently rescheduled to September 15, 2023.  Dkt. No. 2-3, SEC Ex. 3, Aug. 28, 2023 Subpoena.

On September 13, 2023, counsel objected in writing to the testimony.  Among other defects in the Staff's request, counsel objected because it is unclear what additional relevant information the Staff seeks to obtain from a third testimony in an investigation concerning events that happened before the previous two testimonies.  As counsel explained, the only explanation appears to be that the Staff is exercising its subpoena power in bad faith to harass Mr. Musk.  Dkt. No. 2-4, SEC Ex.

4, Sept. 13, 2023 Letter.  Counsel also objected to having the testimony conducted in-person in San Francisco when Mr. Musk resides in Texas.  *Id.*

In response, the Staff stated that it needed to take Mr. Musk's testimony yet again because additional documents had been produced (per subpoenas post-dating Mr. Musk's last testimony) and the Staff had more questions about Mr. Musk's disclosures of his Twitter shares and public statements relating to Twitter in April and May 2022.  The Staff also claimed its "investigation involves more than just the timing and substance of a single Schedule 13 filing" but also "a number of such filings by [Mr. Musk] in April and May 2022, as well as a number of public statements about the Twitter transaction."  Dkt. No. 2-5, SEC Ex. 5, Sept. 14, 2023 SEC Letter.  The Staff subsequently offered several dates in October and November to take Mr. Musk's testimony in Fort Worth, Texas, roughly 200 miles away from Mr. Musk's Austin, Texas residence.  Dkt. No. 2-7, SEC Ex. 7, Sept. 21, 2023 SEC Letter.

Counsel replied, informing the Staff that, in light of the pattern of harassment of Mr. Musk including the "leak of information to the mainstream media, the opening of a frivolous investigation the day after it closed an earlier investigation, and the litany of subpoenas" issued in this matter, Mr. Musk would not appear for the testimony.  Dkt. No. 2-8, SEC Ex. 8, Sept. 24, 2023 Letter.  The following week, the SEC filed the instant action seeking to compel compliance with the Staff-issued administrative subpoena.

***Magistrate Judge Proceedings.***  The matter was initially referred to a magistrate judge as a miscellaneous matter.  When Mr. Musk declined magistrate judge jurisdiction, the case should have been reassigned to a district judge under the local rules because the SEC's application is a dispositive motion.  N.D. Cal. Civ. L. R. 73-1(a)(2); Gen. Order No. 44(E)(1)(c); *see also* Dkt. No. 40 at 1 (order acknowledging this point).  Instead, the matter proceeded to a hearing before Judge Beeler on December 14, 2023.  Judge Beeler issued a Report and Recommendation on February 10, 2024, recommending the grant of the SEC's application.  Dkt. No. 40; Dkt. No. 40-1.  The R&R concluded that (1) the information sought was relevant and material to the investigation and did not constitute harassment; and (2) the SEC Enforcement Staff are non-officer employees not subject to the Appointments Clause and therefore the subpoena was constitutionally enforceable.

1    Judge Beeler initially issued the ruling as an "Order Compelling Compliance with

2    Administrative Subpoena."   Dkt. No. 37.   Because the application was a dispositive motion,

3    Mr. Musk moved to clarify that the ruling could only operate as a report and recommendation.   Dkt.

4    No. 38.   On February 16, 2024, Judge Beeler granted Mr. Musk's motion and issued an R&R

5    incorporating the analysis in the earlier order by reference.   Dkt. No. 39; Dkt. No. 40.

6                                    **LEGAL STANDARD**

7    Because the grant of the application to enforce compliance with an administrative subpoena

8    "disposed of the sole issue in the case, . . . the magistrate order was dispositive."   *Doe v. SEC*, No.

9    C11–80209-CRB, 2011 WL 5600513 at *2 (N.D. Cal. Nov. 17, 2011); *see* Dkt. No. 39.   Thus, this

10   Court "shall make a de novo determination of those portions of the report or specified proposed

11   findings or recommendations to which objection is made."   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ.

12   P. 72(b)(3).

13   Administrative subpoenas from the SEC are not self-enforcing.   *SEC v. Jerry T. O'Brien,*

14   *Inc.*, 467 U.S. 735, 741 (1984).   The SEC bears the burden to show that it (1) has authority to

15   investigate; (2) satisfied all procedural requirements; and (3) that "the evidence [sought] is relevant

16   and material to the investigation."   *FDIC v. Garner*, 126 F.3d 1138, 1142 (9th Cir. 1997); *see also*

17   Dkt. No. 5 (ordering that "the issues are (1) whether Congress has granted the authority to

18   investigate, (2) whether the procedural requirements have been followed, and (3) whether the

19   evidence is relevant and material to the investigation."   (citing *SEC v. Obioha*, No. 12-cv-80109-

20   WHA, 2012 WL 4889286, at *1 (N.D. Cal. Oct. 12, 2012)).

21                                       **ARGUMENT**

22   The subpoena issued by the SEC Staff is flawed several times over.   First, it is overbroad

23   and unreasonable because it seeks a third round of testimony on issues that Mr. Musk—perhaps the

24   busiest business leader in the world—has already covered twice before.   To the extent the Staff

25   failed to raise issues in those sessions that it now wishes it would have, that is a product of the Staff's

26   own choices.   Administrative agencies do not have unlimited opportunities to keep coming up with

27   new ideas on which to question private parties, particularly given the burden such serial testimony

28   imposes on Mr. Musk.   The Court should deny the Staff's request for a third bite at the apple.

1    Separately, the Staff lack constitutional authority to subpoena Mr. Musk in this enforcement

2    investigation.  Only officers of the United States appointed pursuant to the Appointments Clause

3    and removable consistent with the President's power to superintend the Executive Branch can

4    exercise such authority.  But the Staff are not properly appointed or properly removable.  If the

5    Court reaches the issue, it should accordingly deny the application.  At a minimum, the Court should

6    withhold any decision until the Supreme Court resolves the pending *Jarkesy* case.

7    **I.    THE SUBPOENA SEEKING A THIRD ROUND OF TESTIMONY FROM MR. MUSK IS OVERBROAD AND UNREASONABLE**

8    Although the SEC enjoys wide latitude in conducting legitimate investigations, courts are

9    not required to approve unreasonable demands.  Here, the SEC Staff is seeking to compel not a first

10   nor a second but a third round of testimony from Mr. Musk on issues that have been or could have

11   been covered twice before.  This burdensome harassment of Mr. Musk lacks any valid justification.

12   **A.    The Subpoena Lacks A Valid Justification**

13   An administrative subpoena may not be enforced if "the party being investigated proves the

14   inquiry is unreasonable because it is overbroad or unduly burdensome."  *EEOC v. Children's Hosp.*

15   *Med. Ctr. of N. Cal.*, 719 F.2d 1426, 1428 (9th Cir. 1983) (en banc), *overruled on other grounds as*

16   *recognized in Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299, 1303 (9th Cir. 1994).  The SEC's

17   attempt to compel a third round of testimony from Mr. Musk fits into that category.

18   *First*, a subpoena imposes an undue burden if it requests information that is already in an

19   agency's possession or threatens to unduly disrupt or seriously hinder a business's normal

20   operations.  *See Fed. Hous. Fin. Agency v. SFR Invs. Pool 1, LLC*, No. 2:17-CV-00914-GMN-PAL,

21   2018 WL 1524440, at *6–8 (D. Nev. Mar. 27, 2018) (limiting FHFA subpoena to a narrower subset

22   of information because the information requests as-written were overbroad and unduly

23   burdensome).  That is what this subpoena does.  The Staff has already had multiple opportunities to

24   ask Mr. Musk any questions it might have regarding the filings and related communications, and he

25   has produced hundreds of documents in response to its requests.  The Staff's overbroad subpoenas

26   demanded all communications relating to the Twitter acquisition (even postdating the Schedule 13

27   filings), all communications with potential co-investors for a similarly overbroad time period, and

28   all deposition transcripts from the Delaware Court of Chancery action relating to the Twitter

acquisition, which did not even commence until several months after the purportedly untimely filing took place.  Dkt. No. 25-7, Ex. 7, Aug. 8, 2022 Subpoena to Mr. Musk; Dkt. No. 25-8, Ex. 8, Sept. 27, 2022 Subpoena to Mr. Musk; Dkt. No. 25-9, Ex. 9, Sept. 29, 2022 Subpoena to Mr. Musk; *Twitter, Inc. v. Musk*, No. 2022-0613-KSJM, Dkt. No. 1 (Del. Ch. July 12, 2022).  The Staff sent many of these requests to two, three, four, or more individuals and entities.  Spiro Decl. ¶ 15.  Many of these documents post-date the filings—and the decision to acquire Twitter itself—by many months.

Nevertheless, Mr. Musk produced hundreds of pages of documents and made himself available for testimony twice.  The Staff has taken Mr. Musk's testimony for nearly nine hours over the course of two days about his acquisition of Twitter stock in 2022, his conversations with Mr. Musk's wealth manager regarding the required SEC disclosures, and discussions about his potentially joining Twitter's board in April 2022.  After the Staff attempted to exceed the limits of its authority by asking Mr. Musk questions about conduct post-dating the scope of the Formal Order, *see* pp. 5–6, *supra*, it took Mr. Musk's testimony for a second time for approximately four hours regarding another Schedule 13D Amendment and Mr. Musk's acquisition of Twitter.  Spiro Decl. ¶ 18.  The Staff has also taken Mr. Musk's wealth manager's testimony three times.  Other individuals have also been required to sit for testimony.  *Id.* ¶¶ 15, 21.

Although the Staff claims it needs to question Mr. Musk regarding additional documents that have been produced, it fails to mention that it waited until after Mr. Musk's first two testimonies to request these documents—a critical detail that the R&R also ignores.  The Staff provides no reason why it could not have more timely subpoenaed the documents and asked its questions in either of the previous two testimonies.  In any event, there is no further relevant information to uncover in a third testimony.  The SEC's only response is that the Staff's investigation extends not only to allegedly late filings but also to potential Rule 10b-5 violations related to Mr. Musk's public tweets about the Twitter transaction.  Even so, the Staff was aware of these tweets before Mr. Musk's prior two testimonies, and, as the SEC concedes, has already asked about them.  Reply at 5.  The Commission's subpoena for a third testimony of Mr. Musk accordingly imposes an undue burden and should not be enforced.  *See Peters*, 853 F.2d at 700 (quashing overly broad subpoena).

*Second*, the SEC's pursuit of Mr. Musk has crossed the line into harassment, which is quintessential bad faith. As the Supreme Court has made clear, "[p]ersons from whom [an agency] seeks relevant information are not required to submit to [the agency's] demand, if in any respect it is unreasonable or overreaches the authority Congress has given." *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 217 (1946). This principle applies with even greater force when an agency issues a subpoena to an individual, rather than a corporation. *See Resol. Tr. Corp. v. Walde*, 18 F.3d 943, 948–49 (D.C. Cir. 1994) (recognizing that cases that have permitted "agencies the greatest latitude in seeking the information they deem relevant to their duties . . . involve corporations rather than individuals," and noting that "[t]he Supreme Court reminds us that 'corporations can claim no equality with individuals in the enjoyment of a right to privacy'") (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)).

The SEC's campaign against Mr. Musk is precisely the sort of agency action that courts properly refuse to tolerate. *See, e.g.*, *Peters*, 853 F.2d at 700 (quashing overbroad subpoena that amounted to a "fishing expedition"); *United States v. Fensterwald*, 553 F.2d 231, 232 (D.C. Cir. 1977) (authorizing limited discovery in light of allegations of agency bad faith). It is not too much to expect that the Staff decide what questions it needs to ask Mr. Musk, ask Mr. Musk those questions, and then let him carry on with his obligations to his companies and shareholders. The Staff should not be permitted to persist in its pattern of continuing to ask for more documents and then more testimony, over and over again, every time a Staff member decides that it would be helpful to hear more. The Commission's unwillingness to abide by such reasonable limits indicates that the "subpoena [was] not issued in good faith but [instead] to harass or pressure the subject of an investigation," and accordingly should not be enforced. *Brigadoon*, 480 F.2d at 1056.

The government has failed to identify a single factually analogous case where a court has enforced a third subpoena in a similarly meandering, unbounded investigation into an allegedly days-late SEC filing. Of the litany of SEC subpoena enforcement actions cited by the government, none involve a late Section 13 filing. Moreover, none involve a respondent objecting to a third testimony. *See Mot. 6–9*. Rather, they involve cases where respondents failed to comply with the Commission's initial subpoena. *See, e.g.*, *Nelson v. SEC*, No. C08-80080-MISC-(JF)(HRL), 2008

WL 2444794, at *1 (N.D. Cal. June 16, 2008) (respondent refused to comply with an SEC subpoena seeking bank records); *RNR Enters., Inc. v. SEC*, 122 F.3d 93, 95 (2d Cir. 1997) (each respondent refused to comply with SEC subpoena for testimony).  Here, in contrast, Mr. Musk cooperated in good faith with the Commission's many discovery demands, produced hundreds of documents, and appeared for multiple testimony sessions.  Finally, in the cases cited by the Commission, the SEC provided specific cogent reasons why the requested materials were needed to identify a potential securities law violation.[3]  In contrast, here the Commission has failed to explain with specificity why Mr. Musk's testimony is needed yet again.  And the context of the SEC's pattern of ceaseless and successive investigations of Mr. Musk further demonstrates its bad faith.  *See* pp. 3–6, *supra*.

## B. The R&R Provides No Valid Ground For Enforcement

The R&R allowed the Staff to proceed only by misconstruing both the scope of their investigative authority and the Court's own authority to check agency overreach.  The R&R states that only "[m]inimal relevance is required" for enforcement of the subpoena.  R&R at 7.[4]  But that standard ignores the unreasonable scope of the Staff's demands and the fact that it has had ample opportunity to request additional documents but failed to do so until after Mr. Musk's first two testimonies.  *See* pp. 10–11, *supra*.  Rather than reject the Staff's harassment of Mr. Musk, the R&R accepts the SEC's hand-wave explanations at face value and fails to account for the broader context of the most recent subpoena, which is the latest in a long string of SEC abuses of its investigative

---

[3]  *See, e.g.*, *Flatt v. SEC*, No. 10-60073-MC, 2010 WL 1524328, at *4 (S.D. Fla. Apr. 14, 2010) (denied motion to quash an SEC subpoena for respondent's bank records because the SEC asserted it needed the bank records to trace the path of the proceeds of allegedly illegal transactions); *Rosiere v. SEC*, No. 2:09-CV-01975(JCM)(PAL), 2010 WL 489526, at *2 (D. Nev. Feb. 5, 2010) (SEC subpoena of bank records "may help trace the proceeds of possibly illegal transactions for disgorgement and other purposes"); *Gewerter v. SEC*, No. CV-16-02556-PHX-DLR, 2016 WL 4074117, at *2 (D. Ariz. Aug. 1, 2016) (SEC subpoena of bank records needed to trace funds that may have come from a materially false registration statement filed by the respondent); *SEC v. Blackfoot Bituminous, Inc.*, 622 F.2d 512, 513 (10th Cir. 1980) (enforcing subpoena of certain corporate records of respondent relating to their offer and sale to the public of investments in coal lease tax shelter programs).

[4]  Citations to the R&R refer to page numbers in the Court's original analysis (Dkt. No. 40-1), which it incorporated by reference in its February 16, 2024 ruling.  Dkt. No. 40.

---

1  authority.  *See* R&R at 8 (dismissing the agency's repeated investigations as "not demonstrably

2  harassment").  Mr. Musk's objections to the SEC's continuous bad-faith investigations go beyond

3  mere "challenges to the relevancy of the SEC's continued investigation."  *Id.*

4          Finally, the R&R fails to address Mr. Musk's valid objections to the Staff's unreasonable

5  and irrelevant discovery demands.  The SEC misstates the facts to make it appear that Mr. Musk

6  agreed to sit for a third testimony when in fact Mr. Musk preserved his timely objection, and the

7  R&R errs by accepting the Commission's characterization.  *See* R&R at 2–3, 7.  While Mr. Musk's

8  counsel accepted service of the administrative subpoena, counsel did not consent to a third testimony

9  or concede that the Staff has the authority to compel it.  Spiro Decl. ¶ 20.  Accepting service of a

10  subpoena does not preclude a party from challenging efforts to enforce that subpoena in court.  *See,*

11  *e.g.*, *In re Application for Ord. Quashing Deposition Subpoenas, dated July 16, 2002*, No. M8-85,

12  2002 WL 1870084, at *2 (S.D.N.Y. Aug. 14, 2002).  Moreover, administrative subpoenas are not

13  self-enforcing, and Mr. Musk was under no obligation to assert objections or risk waiver.  *See Jerry*

14  *T. O'Brien, Inc.*, 467 U.S. at 741.  In fact, Mr. Musk objected to sitting for a third testimony with

15  the Staff and articulated his reasons.  Mr. Musk's objections regarding the Staff's harassment and

16  its requests for irrelevant information raise valid reasons to refuse to enforce a subpoena.  Yet the

17  R&R fails to adequately address them.

18          Mr. Musk also made a proper objection regarding the location of the testimony.  A court

19  may modify a subpoena to prevent undue burden on a respondent even if the issuing agency has

20  authority to compel attendance at a particular location.  *See SFR Invs.*, 2018 WL 1524440, at *8

21  (narrowing FHFA's document request because it would be unreasonable for the respondent to

22  produce documents from the recorder's office and non-parties).  The Staff has twice taken Mr.

23  Musk's testimony remotely by WebEx.  The R&R provides no reason why Mr. Musk's third

24  testimony must be conducted in person rather than remotely (as before).  If the Court does not quash

25  the subpoena, at a minimum it should order that Mr. Musk's third testimony be conducted remotely

26  for the convenience of the parties, just as his previous two were.

27

28

## II.     ENFORCEMENT OF THE SUBPOENA WOULD VIOLATE THE CONSTITUTION

The subpoena is also unenforceable for the independent reason it was issued via procedures that violate the Constitution.  Under Article II, only a properly appointed officer who is subject to appropriate presidential supervision may exercise authority of the type entrusted to the SEC Enforcement Staff in this case.  But the SEC Staff member who issued the subpoena—like the other Staff purportedly appointed by the Formal Order—was neither appointed in conformance with the Appointments Clause nor removable by the President through the mechanisms required by Article II.  The subpoena is accordingly invalid, and the SEC's application should be denied for either of those alternative reasons.  The R&R makes little effort to engage with this issue.  In only a single paragraph, the R&R incorrectly conflates the exercise of significant government authority with quasi-judicial functions and miscategorizes Enforcement Staff as mere employees despite their prosecutorial function.  *See* R&R at 9–10.

### A.     Enforcement Of The Subpoena Would Violate The Appointments Clause

The Appointments Clause requires that officials exercising significant government authority pursuant to law be appointed in one of several prescribed ways.  Because the SEC Staff member who issued the subpoena to Mr. Musk was not appointed in any of those ways, the subpoena is invalid and cannot be enforced.

#### 1.     The Appointments Clause Does Not Permit Issuance Of The Subpoena By An SEC Enforcement Staff Member

Under the Appointments Clause, all "Officers of the United States" must be appointed by the President, with the advice and consent of the Senate, or—in the case of "inferior Officers"— "the President alone, . . . the Courts of Law, or . . . the heads of Departments."  U.S. Const. art. II, § 2, cl. 2.  Those methods are "the exclusive means of appointing 'Officers.'"  *Lucia*, 138 S. Ct. at 2051.  And conforming to them is "more than a matter of 'etiquette or protocol'; it is among the significant structural safeguards of the constitutional scheme."  *Edmond v. United States*, 520 U.S. 651, 659 (1997).  Compliance with the Appointments Clause ensures that "the President remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people."  *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1988 (2021); *see, e.g.*, *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 884 (1991) ("The Framers

1    understood . . . that by limiting the appointment power, they could ensure that those who wielded it

2    were accountable to political force and the will of the people.").

3        ***Method of Appointment.***    As an initial matter, it is undisputed that the SEC Staff member

4    who issued the subpoena at issue was not appointed by a method consistent with the Appointments

5    Clause—that is, he was not appointed by the President, a court of law, or the head of a department.

6    Rather, he was appointed by the Director of the SEC Division of Enforcement, pursuant to a

7    purported delegation by the Commission.  Dkt. No. 25-3, Ex. 3, Formal Order; Dkt. No. 25-5, Ex.

8    5, Corrected Formal Order; *see* 17 C.F.R. § 200.30-4(a)(1).  While the SEC itself is considered a

9    department, its "head[s]" are the Commissioners—not the Director of the Enforcement Division.

10   *Free Enter. Fund*, 561 U.S. at 510–512; *see Lucia*, 138 S. Ct. at 2051 n.3.  Nor can the

11   Commissioners delegate their Appointments Clause authority to the Director of the Enforcement

12   Division or any other subordinates.  As the Department of Justice's Office of Legal Counsel has

13   explained, "the power to appoint inferior officers . . . may be delegated *only to officials identified*

14   *by the Appointments Clause as competent to appoint inferior officers*."  *Appointment & Removal of*

15   *Fed. Rsrv. Bank Members of the Fed. Open Mkt. Comm.*, 43 Op. O.L.C. __, 19 (Oct. 23, 2019)

16   (emphasis added); *see Lucia*, 138 S. Ct. at 2049 (rejecting the SEC's mechanism for delegating ALJ

17   appointment authority to "staff members, rather than the Commission"); *id.* at 2058 (Breyer, J.,

18   concurring in part) (describing the Commission's attempt "to delegate its power to appoint its

19   administrative law judges to its staff").  The SEC thus correctly concedes that, if the Enforcement

20   Staff are officers, they are unconstitutionally appointed.  Reply at 9–10 (arguing only that Staff are

21   not constitutional officers).

22       ***Officer Status.***    The critical question for Appointments Clause purposes is accordingly

23   whether the SEC Staff are "Officers of the United States."  The Constitution does not define that

24   term.  But it has long been understood to refer to public officials who "exercis[e] significant

25   authority pursuant to the laws of the United States," *Lucia*, 138 S. Ct. at 2051 (quoting *Buckley v.*

26   *Valeo*, 424 U.S. 1, 126 (1976) (per curiam)), and "hold a continuing office established by law," *id.*

27   at 2052; *see Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op.

28   O.L.C. 73, 76–115 (2007).  Here, it is undisputed that Enforcement Staff hold a continuing office

established by law.  *See* 5 U.S.C. § 4802(b); 17 C.F.R. § 200.10; *accord Lucia*, 138 S. Ct. at 2053 (explaining that SEC ALJs hold a continuing office because it is created by statute).  Thus, as the SEC accepts, the dispositive question is whether the SEC Staff at issue exercise significant authority pursuant to the laws of the United States. *See* Reply at 9–12 (arguing only that Staff do not exercise such authority).

They do.  The SEC Staff conducting this investigation are empowered to "administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of . . . records deemed relevant or material to the inquiry, and to perform all other duties in connection therewith as prescribed by law."  Dkt. No. 25-3, Ex. 3, Formal Order; Dkt. No. 25-5, Ex. 5, Corrected Formal Order.  The Supreme Court has repeatedly found investigative authority like that exercised by SEC Enforcement Staff to be indicative of officer status.  *See, e.g.*, *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2193 (2020) (CFPB's "potent enforcement powers" include "the authority to conduct investigations, issue subpoenas and civil investigative demands"); *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1662 (2020) (observing that "[t]he Board has broad investigatory powers: It can administer oaths, issue subpoenas, take evidence and demand data from governments and creditors alike").  The Supreme Court's decision in *Lucia*, which also involved SEC officials, similarly held that SEC ALJs are inferior officers—rather than employees—because their powers to issue subpoenas, administer oaths, examine witnesses, and issue an initial decision give them significant authority pursuant to a continuing position created by statute.  138 S. Ct. at 2049, 2051–54.

Such investigative and prosecutorial powers represent a paradigmatic exercise of the "sovereign power of the United States," *United States v. Providence Journal Co.*, 485 U.S. 693, 700 (1988), and therefore can be performed only by an officer appointed pursuant to the Appointments Clause, *see, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 671 & n.12 (1988) (independent counsel is an officer); *Myers v. United States*, 272 U.S. 52, 159 (1926) (U.S. Attorney is an officer); *United States v. Donziger*, 38 F.4th 290, 296–99 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 868 (2023) (special prosecutor is an officer); *In re Grand Jury Investigation*, 315 F. Supp. 3d 602, 627 (D.D.C. 2018),

*aff'd*, 916 F.3d 1047 (D.C. Cir. 2019) (similar); *see also* 28 U.S.C. § 542 (providing that the Attorney General—the head of a department—may appoint Assistant United States Attorneys).

In fact, the duties of the SEC Enforcement Staff are comparable to or even more significant than the duties of the other officials who have been found to be officers, including: district-court clerks, *Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 258 (1839); a clerk to an assistant treasurer in Boston, *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393–94 (1867); engineers and assistant surgeons, *United States v. Perkins*, 116 U.S. 483, 484 (1886); *United States v. Moore*, 95 U.S. 760, 762 (1877);  and "commissioners of the circuit courts" who "t[ook] . . . bail for the appearance of persons charged with crime." *United States v. Allred*, 155 U.S. 591, 594 (1895).  If clerks, engineers, assistant surgeons, and bail-takers are constitutional officers, so too are SEC Enforcement Staff who "administer oaths and affirmations . . . compel [witnesses'] attendance, take evidence, and require the production of . . . records deemed relevant or material to the inquiry, and to perform all other duties in connection therewith as prescribed by law." Dkt. No. 25-3, Ex. 3, Formal Order.

Perhaps for that reason, the Commission prior to 2009 itself issued every single formal order of investigation, thereby obviating any Appointments Clause concern because the conferral of investigative powers came from a Head of Department with constitutional authority to make such appointments.  *See* Securities Exchange Act Release No. 60448, 74 FR 40068 (Aug. 11, 2009) (temporarily delegating this authority to the Director of Enforcement); Securities Exchange Act Release No. 62690, 75 FR 49820 (Aug. 16, 2010) (making the delegation permanent).

**2.      The R&R And The SEC Fail To Refute The Appointments Clause Flaw**

The R&R provides only one substantive paragraph of analysis on the Appointment Clause, concluding that SEC Staff at issue are "not subject to the Appointments Clause [because] they lack the 'extensive powers . . . comparable to [] a federal district judge conducting a bench trial.'"  R&R at 9 (quoting *Lucia*, 138 S. Ct. at 2049).  Specifically, the R&R suggests that the SEC Staff "are not like the ALJs in *Lucia*" because they "cannot compel compliance with [their] subpoenas." *Id.*

As an initial matter, that reasoning is wrong on its own terms.  While Enforcement Staff subpoenas are not self-enforcing, the same is true of certain ALJ actions.  15 U.S.C. § 78u(e)(1) ("Upon application of the Commission the district courts of the United States and the United States

courts of any territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus, injunctions, and orders commanding (1) any person to comply with the provisions of this chapter, the rules, regulations, and orders thereunder . . . ."); *see, e.g.*, *SEC v. Ambassador Cap. Mgmt., LLC*, No. CV 18-MC-51442, 2019 WL 1785353, at \*1 (E.D. Mich. Apr. 24, 2019) (SEC seeking federal court order enforcing final decision of an ALJ). Moreover, subpoenas issued under the SEC's statutory authority would not be self-enforcing even if they were signed by all five SEC Commissioners themselves—yet there is no dispute that the SEC Commissioners are officers of the United States. The self-enforcing nature of the subpoenas thus cannot be the proper test.[5]

Relatedly, and more broadly, the R&R's reasoning appears to be based on the premise that, because the SEC Staff at issue lack the powers of ALJs, they must not be officers. But that logic is flawed. Cabinet secretaries and military commanders do not have the same powers as ALJs, but they are assuredly officers of the United States—just as ALJs are officers of the United States even though they do not run departments or order troops into battle. Put differently, having ALJ powers is a sufficient condition of being an officer, but not a necessary condition. The necessary condition is the one that the Supreme Court has repeatedly stated: an officer must exercise "significant authority pursuant to the laws of the United States." *Lucia*, 138 S. Ct. at 2051; *Buckley*, 424 U.S. at 126; *Freytag*, 501 U.S. at 881; *see also Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. at 74, 87. By failing to grapple with that standard (rather than simply comparing the SEC Staff with ALJs), the R&R failed to answer the controlling constitutional question.

In the proceedings before Judge Beeler, the SEC attempted to address that question by arguing that the SEC Staff exercise only "investigative" and "informative" powers, which the SEC contends are insufficient to qualify for officer status under the Supreme Court's decision in *Buckley*. Reply at 11 (citing *Buckley*, 424 U.S. at 137). The SEC's position, however, rests on a misreading

---

[5]   The R&R at least arguably seems to recognize as much by stating that "the SEC cannot compel compliance with its subpoenas: it needs a court order." R&R at 9. But it certainly does not follow that no one at "the SEC" is an officer.

of *Buckley*.  In the passage relied on by the SEC, the *Buckley* Court held that Federal Election Commission (FEC) members did not have to be appointed consistent with the Appointments Clause to the extent that they exercise powers "of an investigative and informative nature, *falling in the same general category as those powers which Congress might delegate to one of its own committees*."  *Buckley*, 424 U.S. at 137 (emphasis added).  As the full quotation makes clear, the "investigative and informative" powers referenced are powers to investigate and inform the subjects of *legislation*, not enforcement.  *Id.*  That is why the next sentence in the *Buckley* opinion is: "A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information which not infrequently is true recourse must be had to others who do possess it."  *Id.* at 138 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)).

Making the distinction even sharper, the *Buckley* Court went on to explain that, to the extent FEC Commissioners are exercising "the Commission's *enforcement* power," the Appointments Clause *does apply*.  *Id.*  If anything, then, a proper reading of *Buckley* only reinforces Mr. Musk's contention that SEC Staff members' possession of a broad array of investigatory powers that they may deploy in support of *enforcement* investigations—not merely to inform lawmaking deliberations—requires appointment consistent with the Appointments Clause.  *See* pp. 16–18, *supra*; *cf. Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (explaining that Congress may issue an investigative subpoena to "serve a 'valid legislative purpose,'" but "Congress may not issue a subpoena for the purpose of 'law enforcement,' because 'those powers are assigned under our Constitution to the Executive and the Judiciary'") (citation omitted).[6]

The Commission's other principal argument in the proceedings before Judge Beeler was that SEC Staff cannot be officers subject to the Appointments Clause because there are a large number of SEC Staff and the Supreme Court has indicated that the "vast majority" of federal employees lack officer status.  Reply at 9 (citing *Free Enter. Fund*, 561 U.S. at 506 n.9).  But that argument does

---

[6]   The R&R notes that SEC Staff "perform[] investigative functions" but conspicuously does not endorse the SEC's reading of *Buckley*.  R&R at 9.

not even attempt to engage with the operative constitutional test.  It is true that most federal employees have not traditionally been officers, but that is because Congress and administrative agencies have not traditionally attempted to empower most federal employees to exercise "significant authority pursuant to the laws of the United States."  *Lucia*, 138 S. Ct. at 2051.  It is the SEC's own choice to equip its Staff members with such significant authority that requires their appointment as officers; if the Commission does not want to appoint its Staff as officers, all the Commission must do is stop giving the Staff authority that must be exercised by officers.

The bottom line is that officer status does not turn on the quantity of federal personnel implicated but on what functions those personnel perform—namely whether, as the Supreme Court has repeatedly explained, they "exercise significant authority pursuant to the laws of the United States."  *Lucia*, 138 S. Ct. at 2051; *see also United States v. Germaine*, 99 U.S. 508, 511 (1879) (holding "thousands of clerks in the Departments of the Treasury, Interior and the othe[r]" departments are officers).  Although it may be more convenient for the Commission to entrust such authority to Staff without appointing them, the Constitution does not permit that choice.  *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 944 (1983) ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government.").[7]

**B.    Enforcement Division Staff Are Unconstitutionally Shielded From Removal**

The subpoena is independently defective because the Enforcement Staff are improperly protected from presidential removal in violation of the requirements of Article II.

---

[7]    The government made similar Chicken Little arguments about the difficulties arising from recognizing a large number of officers with respect to ALJs in response to *Free Enterprise Fund* and *Lucia*. *See* Br. of U.S. at 38, *Free Enter. Fund*, 561 U.S. at 477 (2010); *see* Br. of SEC at 25, *Lucia v. SEC*, 138 S. Ct. 2044 (2018).  But the sky has not fallen, even at the Social Security Administration which has more than one thousand ALJs.  Instead, the agencies have readily figured out how to adapt.  Indeed, the SEC has a particularly straightforward option available:  it could revert to its pre-2009 practice. *See supra* at 17.

**1.     Staff Are Subject To Two Layers Of For-Cause Protection**

Through both its vesting of "[t]he executive Power" in the President and its direction that the President "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 1, cl. 1; *id.*, § 3, Article II confers on the President "the general administrative control of those executing the laws, including the power of appointment and removal of executive officers," *Myers*, 272 U.S. at 164; *see, e.g.*, *Seila Law*, 140 S.Ct. at 2198 (2020) ("Since 1789, . . . the Constitution has been understood to empower the President to keep … officers accountable—by removing them from office, if necessary.") (quoting *Free Enter. Fund*, 561 U.S. at 483).  Under current Supreme Court precedent, Congress may cabin the President's removal authority in certain limited ways, including by imposing for-cause removal requirements with respect to the heads of certain multi-member agencies.  *See Humphrey's Executor v. United States*, 295 U.S. 602, 624 (1935).[8]

Critically for present purposes, however, executive officers may not be subject to *two* layers of for-cause protection against presidential removal authority.  *Free Enter. Fund*, 561 U.S. at 484; *see Seila Law*, 140 S. Ct. at 2198.  Thus, in *Free Enterprise Fund*, the Court invalidated a statutory provision directing that members of the Public Company Accounting Oversight Board (PCAOB) could be removed by the SEC only for certain limited forms of wrongdoing, 15 U.S.C. § 7217(d)(3), given that (according to the Government's concession) SEC Commissioners themselves could be removed only for "inefficiency, neglect of duty, or malfeasance in office," 561 U.S. at 487 (citation omitted).  The Court determined that the combined effect of those restrictions, which resulted in the

---

[8]    *Humphrey's Executor* has been subject to emphatic and persuasive criticism for many decades.  *See, e.g.*, *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 194 n.18 (D.C. Cir. 2018) (Kavanaugh, J., dissenting) (collecting examples); *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 352 (5th Cir. 2024) ("[T]he holding of *Humphrey's* is still 'in place' even though its reasoning 'has not withstood the test of time.'" (quoting *Seila Law*, 140 S.Ct. at 2198 & 2198 n.2)).  The government itself has taken the position that *Humphrey's Executor* should be overruled in a case where it cannot be distinguished.  *See* Br. for Respondent at 44–46, *Seila Law*, *supra* (No. 19-7).  And the Court has expressly declined to extend the reasoning of the decision.  *See Seila Law LLC*, 140 S. Ct. at 2199, 2206.  Mr. Musk reserves the right to ask the Supreme Court to overrule *Humphrey's Executor* in this litigation.  But doing so is not necessary to invalidate the subpoena, for the reasons explained in this section.

1   PCAOB's exercise of executive authority without sufficiently meaningful presidential oversight,

2   caused a constitutionally impermissible "diffusion of accountability." *Id.* at 497.

3        So too here. The statutory scheme at issue provides SEC Staff with at least two, and

4   potentially more, levels of protection against presidential removal authority.  First, as the

5   Government has acknowledged, SEC Commissioners cannot be removed by the President except

6   for "inefficiency, neglect of duty, or malfeasance in office." *Free Enter. Fund*, 561 U.S. at 487.

7   Second, SEC Staff also cannot be removed at will.  That is because 5 U.S.C. § 4802 requires the

8   SEC to comply with the merit system principles, which, in turn, provide various protections against

9   removal at will to all its employees, including the director of enforcement. *See generally* 5 U.S.C.

10  §§ 2301-2302.  In addition, SEC Staff are protected by a collective bargaining agreement between

11  their union and the commission. *See* SEC Union, Collective Bargaining Agreement (NTEU Chapter

12  293 Authorized Version), https://www.secunion.org/collective-bargaining-agreement-nteu-chapter-

13  293-authorized-version.  SEC Staff therefore enjoy at least two layers of good-cause protection from

14  the President, which is impermissible for the same reasons that led the Court to invalidate the

15  removal provisions at issue in *Free Enterprise Fund*.  The Fifth Circuit recently reached the same

16  conclusion in striking down the removal protections for SEC ALJs in a decision that is now pending

17  before the Supreme Court. *See Jarkesy*, 34 F.4th at 463.

18       Since the SEC Enforcement Staff are unconstitutionally shielded from the President's

19  removal power under two layers of for-cause protection, the Commission's application to enforce

20  the subpoena should be denied, and any new subpoena it seeks to enforce must be issued by a

21  properly appointed officer.  When an unconstitutional restriction on the President's removal power

22  occurs during an ongoing investigation, litigants are entitled to relief "sufficient to ensure that the

23  [agency actions] to which they are subject will be enforced only by a constitutional agency

24  accountable to the Executive." *Free Enter. Fund*, 561 U.S. at 513.  Here, the appropriate relief is

25  straightforward: the SEC's application to enforce the subpoena should be denied.

26       **2.**    **The SEC Has No Answer For The Removal Restrictions**

27       The SEC argues that Mr. Musk is only entitled to such relief upon a showing that the

28  unconstitutional removal restriction caused an injury.  Reply at 13–14 (citing *Collins v. Yellen*, 141

S. Ct. 1761 (2021)).  But that argument ignores the distinction between prospective and retrospective relief.  In *Collins*, the Supreme Court explained that determining the appropriate remedy when a litigant seeks *retrospective* relief (*e.g.*, vacatur of a judgment) for actions taken by an officer who was shielded by unconstitutional removal protections requires a plaintiff to show that the removal restriction "inflict[ed] compensable harm" (*e.g.*, prevented the President's attempt at removal). *Collins*, 141 S. Ct. at 1788–89.  By contrast, courts have recognized that *prospective* relief is appropriate without such a showing.  *See, e.g.*, *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 592 F. Supp. 3d 568, 587 (E.D. Tex. 2022) (citing *Free Enter. Fund*, 561 U.S. at 491 n.2, 513) ("*Collins* does not address requests for prospective relief. Instead, *Free Enterprise Fund* governs.").  Here, Mr. Musk seeks only prospective relief—the denial of the SEC's application to compel enforcement of the subpoena.  Thus, *Collins*' remedial test does not control.

The proper remedy here is instead clear from the Supreme Court's decision in *Seila Law*. There, Seila Law refused to comply with a civil investigative demand issued by the CFPB that sought information and documents.  *Seila Law*, 140 S. Ct. at 2194.  After the Court found that the agency was unconstitutionally structured, it assumed the demand was unenforceable, and only remanded to the lower court because the CFPB had purported to "ratify" the demand post-hoc.  *Id.* at 2196–97, 2208, 2211.  The subpoena to Mr. Musk has not been subject to any kind of post-hoc "ratification" and therefore cannot be enforced against him.[9]

## III.   ADOPTING THE R&R WOULD BE PREMATURE IN LIGHT OF *JARKESY*

In the alternative, the Court should stay further proceedings in this matter until the Supreme Court issues a decision on the constitutionality of the double for-cause removal protections for SEC ALJs in *Jarkesy*.[10]  Staying this matter pending the Supreme Court's *Jarkesy* decision—which is

---

[9]  The R&R did not address the removal issue because it concluded that Enforcement Staff are not officers of the United States.  That is mistaken for the reasons discussed above.

[10]  The Fifth Circuit in *Jarkesy* separately held that the defendants in an SEC in-house proceeding were deprived of their Seventh Amendment right to a civil jury and that Congress unconstitutionally delegated legislative power to the SEC without providing an intelligible principle in allowing the Commission to bring enforcements within the agency or in federal court.  *See Jarkesy*, 34 F.4th at 465–66.  Both of those holdings are before the Supreme Court as well.

likely to be issued by June at the latest—is the most efficient and fair course of action for the parties. *See Mediterranean Enters. Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983) (a court "may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case") (quoting *Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 863–64 (9th Cir. 1979)).  In determining whether to issue a stay, a court must weigh the following: "[1] the possible damage which may result from the granting of a stay, [2] the hardship or inequity which a party may suffer in being required to go forward, and [3] the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay."  *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962).  Given that the Supreme Court's upcoming decision may very well remake the landscape of administrative law and removal restrictions as it pertains to the SEC, the Court should exercise its broad discretion here to issue a stay pending the resolution of *Jarkesy*.  *See, e.g.*, *Amini v. AUS Mktg. Rsch. Sys., Inc.*, No. SA-CV-15-1270(AG)(JCGx), 2016 WL 7647690, at *2 (C.D. Cal. Feb. 26, 2016) (issuing stay pending the Supreme Court's decision in *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)).

## CONCLUSION

This Court should decline to adopt the R&R and should deny the Commission's application to enforce the subpoena.  In the alternative, the Court should stay this proceeding pending the Supreme Court's decision in *Jarkesy*.

Dated: March 1, 2024

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/ Alex Spiro*
Alex Spiro (*pro hac vice*)
51 Madison Ave, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
alexspiro@quinnemanuel.com

Christopher G. Michel (*pro hac vice*)
Rachel G. Frank (California Bar No. 330040)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538 8000
Facsimile: (202) 538 8100
christophermichel@quinnemanuel.com
rachelfrank@quinnemanuel.com

*Attorneys for Elon Musk*