UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    v.<br><br>ELON MUSK,<br><br>        Defendant. | Case No. 3:23-mc-80253-JSC<br><br>**ORDER RE: MOTION FOR DE NOVO DETERMINATION OF DISPOSITIVE MATTER REFERRED TO MAGISTRATE JUDGE**<br><br>Re: Dkt. No. 40, 42 |

The Securities and Exchange Commission ("SEC") applied for an order compelling Elon Musk to comply with an SEC administrative deposition subpoena. (Dkt. No. 1.)[1] Magistrate Judge Laurel Beeler issued a report and recommendation in which she recommended granting the SEC's application to enforce the subpoena. (Dkt. Nos. 37, 40.) Now pending before the Court is Musk's motion for de novo review of Judge Beeler's Report and Recommendation. (Dkt. No. 42.) Having reviewed the matter de novo, the Court AFFIRMS the Report and Recommendation, and GRANTS the SEC's motion to enforce the subpoena. The SEC's actions were constitutional, and the subpoena reasonably seeks information relevant to the SEC's investigation.

**BACKGROUND**

**I.    FACTUAL BACKGROUND**

The factual background of this dispute is chronicled in Judge Beeler's Report and Recommendation (Dkt. Nos. 37, 40), and the Court incorporates it by reference here.

**II.    PROCEDURAL BACKGROUND**

The SEC moved for an order compelling Elon Musk to comply with the SEC's

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

administrative deposition subpoena. (Dkt. No. 1.) The matter was initially assigned to Magistrate Judge Laurel Beeler. (Dkt. No. 4.) Musk declined Magistrate Judge jurisdiction. (Dkt. No. 16.) Judge Beeler issued an order compelling compliance with the administrative subpoena. (Dkt. No. 37.) Musk timely filed an administrative motion to clarify whether the order operated as a report and recommendation because the order was dispositive. (Dkt. No. 38.) Judge Beeler agreed the order was dispositive, and issued a report and recommendation that incorporated the contents of her previous order. (Dkt. No. 40.)

Musk then moved for de novo review of Judge Beeler's Report and Recommendation and asked for an order denying the application. (Dkt. No. 42.) The Court accepts review and evaluates the matter de novo.

**LEGAL STANDARD**

"[A] district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also* N.D. Cal. Civ. L.R. 72–3(a). The Court "consider[s] the matter anew, as if no decision had been rendered below." *United States v. Silverma*n, 861 F.2d 571, 576 (9th Cir. 1988). A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**DISCUSSION**

**I.   WHETHER THE SUBPOENA IS UNDULY BURDENSOME**

"The scope of the judicial inquiry in an . . . agency subpoena enforcement proceeding is quite narrow. The critical questions are: (1) whether Congress has granted the authority to investigate; (2) whether procedural requirements have been followed; and (3) whether the evidence is relevant and material to the investigation." *E.E.O.C. v. Fed. Exp. Corp.*, 558 F.3d 842, 848 (9th Cir. 2009) (quoting *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076 (9th Cir. 2001)).

The SEC has satisfied those three requirements. First, Congress has granted the SEC broad investigative power, including the power to issue subpoenas. *See S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 741 (1984) ("Congress has vested the SEC with broad authority to

1  conduct investigations into possible violations of the federal securities laws and to demand
2  production of evidence relevant to such investigations."); 15 U.S.C.A. § 78u(a)-(b) (granting the
3  SEC the authority to investigate violations of securities exchange rules and to subpoena witnesses
4  as part of those investigations).  Second, the SEC has demonstrated it met all procedural
5  requirements in this case, as the subpoena was issued pursuant to a formal order initiating an
6  investigation into Musk for potential securities fraud violations.  (Dkt. No. 26-2.)  Third, the
7  SEC's request to question Musk, the subject of an investigation, meets the low standard of
8  relevance for agency subpoenas.  *See E.E.O.C. v. Karuk Tribe Hous. Auth.*., 260 F.3d 1071, 1076
9  (9th Cir. 2001) ("[C]ourts must enforce administrative subpoenas unless the evidence sought by
10 the subpoena [is] plainly incompetent or irrelevant to any lawful purpose of the agency.") (cleaned
11 up); *United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1113 (9th Cir. 2012) ("The
12 relevance requirement" in assessing agency subpoena requests "is 'not especially constraining'")
13 (quoting *E.E.O.C. v. Fed. Exp. Corp.*, 558 F.3d 842, 854 (9th Cir. 2009)); *E.E.O.C. v. Shell Oil
14 Co.*, 466 U.S. 54, 68–69 (1984) (in the context of agency subpoenas, "courts have generously
15 construed the term 'relevant' and have afforded [agencies] access to virtually any material that
16 might cast light on the allegations").

17    When, as here, the agency has shown it meets the above three factors, "the subpoena
18 should be enforced unless the party being investigated proves the inquiry is unreasonable because
19 it is overbroad or unduly burdensome."  *See E.E.O.C. v. Children's Hosp. Med. Ctr.*, 719 F.2d
20 14261428 (9th Cir. 1983) (en banc), *overruled on other grounds as recognized in Prudential Ins.
21 Co. v. Lai*, 42 F.3d 1299, 1303 (9th Cir. 1994); *see also F.D.I.C. v. Garner*, 126 F.3d 1138, 1145
22 (9th Cir. 1997) ("[O]nce an agency establishes that it has properly issued a subpoena, it should be
23 enforced unless the party being investigated proves the inquiry is unreasonable because it is
24 overbroad or unduly burdensome.") (cleaned up).

25    Musk has not met his burden of demonstrating the subpoena is unreasonable.  He objects
26 the subpoena is unduly burdensome because it is the SEC's third request for testimony, and the
27 SEC "does not identify any topics for this session that it could not have covered in the prior
28 rounds of testimony."  (Dkt. No. 44-1 at 7.)  While the SEC deposed Musk twice before—on July

1    12, 2022 and July 27, 2022—each of those depositions lasted only a half-day.  (Dkt. No. 2 ¶ 6.)
2    Moreover, the second deposition occurred only after Musk objected to the scope of the questions
3    asked during the first deposition, causing the parties to adjourn testimony and resulting in the July
4    15, 2022 amended formal order clarifying the scope of the investigation.  (*Id.* ¶ 5.)  Finally, while
5    the SEC cites no case indicating court approval for three or more rounds of testimony via agency
6    subpoena, Musk cites no case indicating three rounds of testimony is per se overly burdensome.
7    Under these circumstances, the SEC's conduct is not unreasonable.

8        Musk's insistence the SEC "had ample opportunity to request additional documents but
9    failed to do so until after Mr. Musk's first two testimonies" (Dkt. No. 42 at 18), is unpersuasive.
10   The previous two half-day deposition sessions occurred only two weeks apart, just a few months
11   after the SEC's investigation into Musk began.  Then, approximately a year later and after
12   receiving "thousands of new documents" from Musk and third parties, the SEC requested a
13   follow-up deposition to question Musk about those documents and its findings during the
14   investigation.  (Dkt. No. 2 ¶ 7.)  Under Musk's theory of reasonableness, the SEC must wait to
15   depose a percipient witness until it has first gathered all relevant documents.  But the law does not
16   support that theory.  Nor does common sense.  In an investigation, the initial depositions can help
17   an agency identify what documents are relevant and need to be requested in the first place.

18       Musk also argues this subpoena is "the latest in a long string of SEC abuses of its
19   investigative authority."  (*Id.* at 18-19.)  But Musk's lament does not come close to meeting his
20   burden of proving "the subpoena was issued in bad faith or for an improper purpose."  (Dkt. No.
21   37 at 7 (citing *United States v. Powell*, 379 U.S. 48, 58 (1964) (holding, in the context of judicial
22   enforcement of an administrative summons of the Internal Revenue Service, "[t]he burden of
23   showing an abuse of the court's process is on the taxpayer").)  As Judge Beeler explained, the
24   investigations Musk contends constitute harassment are "legitimate government investigations,"
25   and other investigations by the SEC are not relevant to the current investigation.  (Dkt. No. 37 at
26   8.)  Further, contrary to Musk's contention the current investigation merely alleges a "days-late
27   SEC filing" (Dkt. No. 42 at 17), the investigation also includes inquiries into Musk's "numerous
28   filings in April and May 2022" and "whether Musk violated Section 10(b) of the Exchange Act

1  and Rule 10b-5 thereunder." (Dkt. No. 29 ¶ 7.)

2  Finally, Musk objects that he should be allowed to be deposed remotely rather than in

3  person. At oral argument, the SEC explained why in-person testimony is necessary for this third

4  round of testimony—in-person testimony will more easily allow for assessment of Musk's

5  demeanor and be more efficient as it avoids delays caused by technology.

6  Accordingly, the SEC met its prima facie burden as it has demonstrated the subpoena was

7  issued according to the SEC's congressionally authorized authority, was procedurally proper, and

8  seeks relevant testimony. Musk has not demonstrated the subpoena was overbroad, unduly

9  burdensome, or otherwise unreasonable. So, the subpoena must be enforced.

## II.     WHETHER THE SUBPOENA VIOLATES THE CONSTITUTION

### A.     The Appointments Clause

Pursuant to Article II's Appointments Clause, all "Officers of the United States" must be appointed by the President, with the advice and consent of the Senate, or—in the case of "inferior Officers"—"the President alone, . . . the Courts of Law, or . . . the heads of Departments." U.S. Const. art. II, § 2, cl. 2. Musk contends the subpoena is "unenforceable" because "it was issued via procedures that violate . . . Article II" of the Constitution. (Dkt. No. 42 at 20.) Specifically, Musk urges the subpoena was issued by an officer of the United States who was not appointed in accordance with Article II's requirements.

The Exchange Act authorizes "the Commission" to "make such investigations as it deems necessary to determine whether any person has violated" securities laws. 15 U.S.C. § 78u(a)(1). The Commission has delegated authority to "order the making of" such investigations to the Director of the Division of Enforcement ("Director of Enforcement"). 17 C.F.R. § 200.30-4(a)(13). Further, "[f]or the purpose of any such investigation . . . any member of the Commission or any officer designated by it," including the Director of Enforcement, "is empowered to administer oaths and affirmations, subpena [sic] witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records which the Commission deems relevant or material to the inquiry." 15 U.S.C. § 78u(b); 17 C.F.R. § 200.30-4(a)(1). However, "[s]ubpoenas issued by the" SEC "are not self-enforcing, and the

recipients thereof are not subject to penalty for refusal to obey." *S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 741 (1984). Instead, as happened here, "the Commission is authorized to bring suit in federal court to compel compliance" with its subpoenas. *Id.*

The subpoena was issued by Robin Andrews, an SEC Senior Counsel ("the Senior Counsel"). (Dkt. Nos. 2 ¶ 1; 2-3 at 2.) The SEC "head[] of Department[]"is the "full Commission," meaning the "Commissioners jointly." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 512-513 (2010); *see also Lucia v. S.E.C.*, 585 U.S. 237, 243 (2018) ("To be sure, the Commission itself counts as a 'Head[ ] of Department[ ].'"). The Commission appointed the Director of Enforcement to his position. *See* 17 C.F.R. § 200.30-4(a)(13). The SEC's Director of Enforcement then authorized the Senior Counsel to issue the subpoena—so the Director of Enforcement, rather than the Commission (head of department), appointed the Senior Counsel. (Dkt. No. 26-2 at 3 (Director of Enforcement order appointing the Senior Counsel as an "officer[] of the Commission" who is "empowered to . . . subpoena witnesses.").) As neither the President, nor a court, nor the head of the department appointed the Senior Counsel, the parties agree that if the Senior Counsel is properly characterized as an Appointments Clause officer, then the subpoena violates Article II of the Constitution. So, the question turns on whether the Senior Counsel is an officer or non-officer employee.

The Supreme Court's "basic framework for distinguishing between officers and employees" focuses on (1) whether the individual holds "a 'continuing' position established by law;" and (2) "the extent of power an individual wields in carrying out his assigned functions." *Lucia*, 585 U.S. at 245 (citing *United States v. Germaine*, 99 U.S. 508, 511-12 (1878) and *Buckley v. Valeo*, 424 U.S. 1, 126 (1976), respectively).

The Senior Counsel holds a continuing office established by law. 5 U.S.C.A. § 4802(b). So, the inquiry's focus is whether the Senior Counsel has sufficient power to qualify as an officer—whether he "exercis[es] significant authority pursuant to the laws of the United States." *Lucia*, 585 U.S. at 238 (quoting *Buckley*, 424 U.S. at 126). He does not. The Senior Counsel cannot initiate his own investigations, force an individual to comply with a subpoena, or issue decisions in cases. His "scope of authority" is "extremely limited" and "carefully circumscribed"

6

by his superiors.  *U.S. ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 98 (D.D.C. 2004).  Indeed, he follows the Director of Enforcement's direction and performs investigatory functions to aid in the Director's tasks and enforcement priorities.  Such investigative aid work does not constitute "significant authority."

Musk asserts the Senior Counsel has sufficient authority to be an officer for constitutional purposes because he can "administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of . . . records deemed relevant or material to the inquiry."  (Dkt. No. 26-2 at 3.)  Citing *Seila Law*, *Aurelius Investment*, and *Lucia* he contends the "Supreme Court has repeatedly found investigative authority like that exercised by SEC Enforcement Staff to be indicative of officer status."  Not so.

*Selia Law* did not address the distinction between officers and non-officer employees; instead, the Court determined the Consumer Financial Protection Bureau *as an agency* violated the separation of powers and Article II of the Constitution because the agency was "run by a single individual who [could not] be removed by the President unless certain statutory criteria [we]re met."  *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204-05 (2020).  In so holding, the Court explained the Director of the Consumer Financial Protection Bureau was "hardly a mere legislative or judicial aid," because "the Director possesses the authority to promulgate binding rules," "the Director may unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications,"  and "the Director's enforcement authority includes the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court."  *Id.* at 218-19.  Indeed, the Court noted "[e]veryone agrees the [Consumer Financial Protection Bureau Director] is not an inferior officer"—there was no suggestion the Director was a mere employee, an authority level below that of an inferior officer.  *Id.* at 219.  In contrast, here, the SEC Senior Counsel was acting as an investigative aid to the Director of Enforcement— according to the Director of Enforcement's explicit instructions, the Senior Counsel performed tasks to help the Director investigate Musk.  Such activities are a far cry from the authority of the Director of the Consumer Financial Protection Bureau.

Similarly, in *Aurelius Investment*, the Supreme Court held "the Appointments Clause

7

governs the appointments of all officers of the United States, including those located in Puerto Rico," despite arguments that "officers of the United States" did not reach officials in U.S. territories such as Puerto Rico. *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1654 (2020). However, the Court explained two other "provisions of the Constitution empower Congress to create local offices for . . . Puerto Rico" and because the Appointment Clause's reference to "'Officers of the United States' has never been understood to cover those whose powers and duties are primarily local in nature and derive from these two constitutional provisions," the particular Board members at issue were not subject to the Appointments Clause's terms of selection. *Id.* at 1654-55 (citing art. I, § 8, cl. 17; art. IV, § 3, cl. 2). The Court acknowledged the Financial Oversight and Management Board possessed "broad investigatory powers" such as administering oaths and issuing subpoenas, but the Court also explained the Board had the "authority to file for bankruptcy on behalf of Puerto Rico," to "supervise and modify Puerto Rico's laws (and budget), and to "gather evidence and conduct investigations in support of these efforts." *Id.* at 1655, 1662. So, not only was the Court's inquiry removed from the officer/non-officer employee distinction, but the Court also explained the Financial Oversight and Management Board had significant powers the Senior Counsel lacks.

In *Lucia*, the Supreme Court held an SEC Administrative Law Judge ("ALJ") was an "Officer[]" under the Appointments Clause of the Constitution. *Lucia*, 585 U.S. at 241. The Court explained an SEC ALJ "exercises authority 'comparable to' that of a federal district judge conducting a bench trial." *Id.* at 242 (quoting *Butz v. Economou*, 438 U.S. 478, 513 (1978)). Musk argues the SEC Senior Counsel at issue here has a similar level of authority as an SEC ALJ because "[w]hile Enforcement Staff subpoenas are not self-enforcing, the same is true of certain ALJ actions." (Dkt. No. 42.) Granted, *some* SEC ALJ actions are not self-enforcing. *See Lucia*, 585 U.S. at 248, 250 (explaining "the Commission retains discretion to review an ALJ's initial decision" in a case, but an SEC ALJ can "enforce compliance with discovery . . . by means as severe as excluding the offender from the hearing") (citations and quotations omitted). But the SEC ALJ, unlike the Senior Counsel here, exercises significant authority through its adjudicatory role. *See id.* at 249 (explaining SEC ALJs "issue decisions containing factual findings, legal

8

conclusions, and appropriate remedies" and the "SEC can decide against reviewing an ALJ decision," so that the "ALJ's decision . . . becomes final and is deemed the action of the commission") (citations omitted).  In contrast, the Senior Counsel has no such adjudicatory role; he merely conducts investigations at the request of the Director of Enforcement to help carry out the Director's own objectives.

Moreover, the Supreme Court has indicated investigative activities, without enforcement power, constitute the work of employees, not officers.  In *Buckley*, the Supreme Court held the Federal Elections Commission, created by the Federal Election Campaign Act, violated the Appointments Clause of the Constitution.  *Buckley v. Valeo*, 424 U.S. 1 (1976).  The Court detailed the Federal Elections Commission's functions, including acting as "the principal repository of the numerous reports and statements" which were "required . . . to be filed by those engaging in the regulated political activities," "filing and indexing" such reports and statements, and "auditing and field investigations" related to the administration of elections.  *Id.* at 109.  However, "[b]eyond these recordkeeping, disclosure, and investigative functions," the Commission also had "extensive rulemaking and adjudicative powers," including making rules to carry out the provisions of the Federal Elections Campaign Act, "render[ing] advisory opinions with respect to activities possibly violating the Act," and "institute[ing] a civil action for [] injunctive or other relief" for violations of the Act.  *Id.* at 110-11.  For example, the Commission could disqualify candidates from future elections if the Commission found the candidate failed to file a required report.  *Id.* at 112.  The Court distinguished between the Commission's fact-finding and enforcement powers, explaining:

> Insofar as the powers confided in the Commission are essentially of an investigative and informative nature, falling in the same general category as those powers which Congress might delegate to one of its own committees, there can be no question that the Commission as presently constituted may exercise them. . . .  But when we go beyond this type of authority to the more substantial powers exercised by the Commission, we reach a different result. The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress.

*Id.* at 137-38.  Here, the Senior Counsel's authority is exclusively "investigative and informative

in nature"—he does not have the authority to initiate a civil action (only the Director of Enforcement or Commission itself can initiate such an action)—indicating he is a non-officer employee.

Musk's attempts to distinguish *Buckley* are unavailing. First, Musk argues "*Buckley*'s reference to 'investigatory and informative' powers addressed only authority to investigate and inform the content of *legislation*—not to investigate in support of law enforcement actions" (Dkt. No. 44-1 at 11). But, Musk does not explain why such a distinction is relevant in assessing the authority possessed by an individual, and the Court discerns no reason why such a distinction is relevant here. Musk nonetheless insists *Buckley* supports classifying the Senior Counsel as an officer because, in *Buckley*, the Court noted:

> If a postmaster first class, . . .and the clerk of a district court, . . . , are inferior officers of the United States within the meaning of the Appointments Clause, as they are, surely the Commissioners before us are at the very least such "inferior Officers" within the meaning of that Clause.

*Id.* at 126 (citing *Myers v. United States*, 272 U.S. 52 (1926) (indicating a postmaster is an inferior officer) and *In re Hennen*, 38 U.S. 230, 258 (1839) (indicating a district court clerk is an inferior officer)). *Buckley* did not directly address the line between officers and employees because there was "no claim made that the Commissioners are employees of the United States rather than officers," as both parties agreed the Commissioners were clearly officers. *Id.* at 126 n.162. Moreover, *Buckley* did not hold *all* United States employees are federal officers. Indeed, *Buckley* explained "[e]mployees are lesser functionaries subordinate to officers of the United States." *Id.* at n.162. So, *Buckley* supports classifying the Senior Counsel as an employee: the Senior Counsel, as a subordinate to the Director of Enforcement, exercised investigative functions to aid the Director of Enforcement.

Musk also analogizes the Senior Counsel to a federal prosecutor and cites cases indicating federal prosecutors are officers for purposes of Article II. *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 671 & n.12 (1988) (independent counsel—with authority to investigate and prosecute "certain federal crimes"—is an inferior officer); *United States v. Donziger*, 38 F.4th 290, 294, 296–99 (2d Cir. 2022) (holding "special prosecutors are officers under the Appointments Clause"

because they "wield federal prosecutorial power and hold a position that is not personal to a specific individual and may last for years"), *cert. denied*, 143 S. Ct. 868 (2023)*; In re Grand Jury Investigation*, 315 F. Supp. 3d 602, 627 (D.D.C. 2018), *aff'd*, 916 F.3d 1047 (D.C. Cir. 2019) (holding special counsel is an inferior officer); *Myers v. United States*, 272 U.S. 52, 159 (1926) ("Finally, *Parsons'* Case . . . conclusively establishes for this court that the legislative decision of 1789 applied to a United States attorney, an inferior officer.") (citing *Parsons v. United States*, 167 U.S. 324 (1897), which involved the removal of the United States Attorney for the Northern District of Alabama)). The SEC contends none of these cases establish line Assistant U.S. Attorneys—rather than special prosecutors, independent counsel, or U.S. Attorneys—are federal officers.

But, even assuming line Assistant U.S. Attorneys are federal officers does not support concluding the Senior Counsel is an officer because federal prosecutors have powers the Senior Counsel lacks. Federal prosecutors have the authority to *bring* charges, an authority possessed only by the SEC's Director of Enforcement or the Commission, and not individual SEC staff members like the Senior Counsel. *See, e.g.*, *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987) ("A prosecutor exercises considerable discretion in matters such as the determination of which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses, whether to enter into plea bargains and the terms on which they will be established, and whether any individuals should be granted immunity."). The Senior Counsel cannot even initiate his own investigation, he only follows the Director's explicit direction to help collect information for Director-authorized investigations. Moreover, the SEC does not bring criminal charges, as its enforcement authority is limited to civil suits, which involve less risk of constraining individual liberty.

Indeed, the scope of the SEC Senior Counsel's authority is, in some ways, less than that of private civil attorneys, who can issue subpoenas and compel discovery. Under the usual rules of civil discovery, each party is permitted 10 depositions "without leave of the Court." Fed. R. Civ. Pro. 30. Federal Rules of Civil Procedure 45 permits civil attorneys to "command[]" an

11

individual's "attendance at a deposition" by issuing a subpoena. Fed. R. Civ. P. 45(a)(1)(B). If the individual who receives the subpoena believes it is unreasonable or unduly burdensome, that individual can move to quash or modify the subpoena. Fed. R. Civ. P. 45(d)(3). In such scenarios, the party moving the squash the subpoena bears the burden of persuasion. *Free Stream Media Corp. v. Alphonso Inc.*, No. 17-CV-02107-RS (KAW), 2017 WL 6209309, at *3 (N.D. Cal. Dec. 8, 2017); *Genus Lifesciences Inc. v. Lannett Co., Inc.*, No. 18-CV-07603-WHO, 2019 WL 7313047, at *3 (N.D. Cal. Dec. 30, 2019). In contrast, the Senior Counsel could not compel Musk to testify—the SEC (rather than Musk, as the recipient of the subpoena) had to petition this Court to enforce the subpoena.

Finally, Musk argues both Congress (in the Exchange Act) and the SEC (in its formal order granting the Senior Counsel subpoena power) refer to the Senior Counsel as an "officer," which, "reinforces that Enforcement Staff vested with the investigatory powers enumerated in the Exchange Act and the Formal Order are officers of the United States because they exercise significant authority of the United States." (Dkt. No. 44-1 at 9.) As support, Musk cites *United States v. Germaine*, where the Supreme Court held a statute that criminalized extortion done by "[e]very officer of the United States" did not apply to a government-appointed civil surgeon because he was not an officer of the United States. 99 U.S. 508 (1878). The Court explained:

> It is . . . not to be supposed that Congress, when enacting a criminal law for the punishment of officers of the United States, intended to punish any one not appointed in one of th[e] modes [listed in the Appointments Clause of the Constitution]. If the punishment were designed for others than officers as defined by the Constitution, words to that effect would be used, as servant, agent, person in the service or employment of the government; and this has been done where it was so intended[.]

*Id.* at 510. Musk also cites to Justice Breyer's partial concurrence in *Lucia*, in which he explained "given the constitutional language, the Court, when deciding whether other positions are 'Officers of the United States' under the Appointments Clause, should give substantial weight to Congress' decision." *Lucia*, 585 U.S. at 264 (Breyer, J., concurring in the judgment in part and dissenting in part).

But while Congressional intent is relevant to the officer/employee inquiry, the use of the

word "officer" in the Exchange Act or the Director of Enforcement's formal order does not necessarily indicate the individual is an "Officer of the United States" within the meaning of Article II.  The SEC formal order "designated" the Senior Counsel as an "officer of the Commission" for purposes of the Musk investigation (Dkt. No. 26-2 at 3)—suggesting a distinction between "officers of the United States" as referenced in the Appointments Clause, and officers of agencies of United States, like the SEC.  *See also* The Exchange Act,  15 U.S. Code § 78u(b) ("For the purpose of any such investigation, or any other proceeding under this chapter, any member of the Commission or any officer designated by it is empowered to . . . subpena [sic] witnesses."); *Aurelius Inv.*, 140 S. Ct. at 1658 (explaining if the relevant individuals "are not officers of the United States, *but instead are some other type of officer*, the Appointments Clause says nothing about them." (emphasis added)).  Moreover, Musk himself admits this "usage" argument "is not dispositive (because the words of the Constitution rather than those of Congress or the agency ultimately control)." (Dkt. No. 44-1 at 9.)  So, the textual language of the Exchange Act and formal order do not turn the Senior Counsel into a constitutional officer.

In sum, no case has held the power to issue subpoenas that require court action to compel compliance and the authority to complete other investigative tasks—under the supervision and direction of a supervisor—constitute sufficient authority to qualify as an officer under the Appointments Clause.  Musk has not persuaded this Court it should be the first.  Because the Senior Counsel does not exercise significant authority pursuant to the laws of the United States, he is a non-officer employee, and therefore not subject to the Appointments Clause requirements.

### B. Removal Power Principles of Article II

Article II of the Constitution also "grants to the President the executive power of the government—i.e., the general administrative control of those executing the laws, including the power of . . . removal of executive officers." *Myers v. United States*, 272 U.S. 52, 163–64 (1926).  The Supreme Court has upheld "limits on the President's removal power," in particular cases. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 514 (2010).  But Congress's ability to restrict the President's removal power is not unlimited—for example, the Supreme Court has held two layers of for-cause protection over *officers* is unconstitutional.  *Id.*   Musk asserts

13

there are two layers of for-cause removal protection over the Senior Counsel who issued the subpoena in this case, and therefore the removal process for the Senior Counsel is unconstitutional. But that argument relies on the Senior Counsel being an *officer* under Article II—as a mere employee, the Constitution's removal requirements do not apply. Because the Court holds the Senior Counsel is not an officer under Article II of the Constitution, Musk's removability challenge fails.

At oral argument, Musk argued his removal challenge also applies to the SEC's Director of Enforcement, not just the SEC Senior Counsel. In his brief, Musk asserts "5 U.S.C. § 4802 requires the SEC to comply with the merit system principles, which, in turn, provide various protections against removal at will to all its employees, including the director of enforcement." (Dkt. No. 42 at 28.) However, all of Musk's removal arguments focus on SEC Enforcement Division *staff*, such as the Senior Counsel, rather than the Director of Enforcement. (*See, e.g.*, Dkt. No. 42 at 26-27 (heading of argument reads "Enforcement Division Staff Are Unconstitutionally Shielded From Removal" and subheading provides "Staff Are Subject To Two Layers Of For-Cause Protection").) Moreover, Musk's briefing does not directly challenge the Director of Enforcement's formal order directing investigation, instead it focuses on the subpoena; so it is unclear what, if any, of the Director's actions Musk believes were unconstitutional. Finally, at oral argument before Judge Beeler, Musk conceded that if Judge Beeler "d[id]n't agree with [Musk] that [the staff are] officers, then [the removal] argument is off the table." (Dkt. No. 35 at 16.) Accordingly, Musk did not preserve any argument that because the Director of Enforcement is subject to two levels of removal protection the subpoena is unconstitutional.

Musk also argues "the Court should stay further proceedings in this matter until the Supreme Court issues a decision on the constitutionality of the double for-cause removal protections for SEC ALJs in *Jarkesy*." (Dkt. No. 42 at 29; citing *Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446, 463 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023)). In *Jarkesy*, the Fifth Circuit held the removal restrictions on SEC ALJs are unconstitutional. *Jarkesy*, 34 F.4th at 464. The case remains pending before the Supreme Court. But, as the Supreme Court has already held SEC ALJs are inferior officers, *Lucia*, 585 U.S. at 251, the Supreme Court is unlikely to revisit the

14

officer-employee distinction in its *Jarkesy* decision. Since the determination that the SEC enforcement staff member is not an officer is dispositive of the issue, and because that determination is unlikely to be affected by the Court's *Jarkesy* opinion, the Court declines to stay the case.

## CONCLUSION

For the reasons explained above, and having reviewed the Report and Recommendation de novo, the Court ADOPTS Judge Beeler's recommendation to compel Musk's testimony.

The Court therefore ENFORCES the SEC's subpoena, though it limits the SEC to 5 hours of questioning to occur within 60 days of this Order. Moreover, the Court ORDERS the parties to meet and confer to decide upon a date and deposition location. On or before May 30, 2024, the Parties must jointly submit a letter to the Court indicating the date and location of the scheduled deposition.

This Order disposes of Dkt. Nos. 40, 42.

**IT IS SO ORDERED.**

Dated: May 14, 2024

JACQUELINE SCOTT CORLEY
United States District Judge